7228

McCRARY v. SOUTHERN RY.

1. Evidence—Master and Servant—Rule Book—Reply.—In suit by servant against master, servant may put rule book in evidence and then or thereafter call attention to such rules as he desires to stress, and if the master is surprised by reliance on a rule not mentioned before he closes his evidence he should be permitted to reply.

2. Ibid.—Relevancy of evidence is a matter within discretion of trial Judge.

3. Master and Servant—Negligence—Contributory Negligence—Brakeman.—Testimony tending to show a brakeman was kept on duty for an unreasonable time without rest, and while in this condition was run over by a freight train while lying on the track asleep, tends to show negligence on the part of the master and does not conclusively show contributory negligence on the part of the servant.

4. Charge—Requests—Waiver.—An attorney by handing up requests to charge before arguing a motion to direct a verdict and saying, in response to query from other side, after ruling, that he had handed up some propositions but the ruling had covered most of them, waives the right to have the requests passed on.

Before GARY, J., Richland.    Affirmed.

Action by L. I. McCrary, administratrix of E. D. McCrary, against Southern Railway, W. T. Wright, F. L. Shillitto and O. F. McEachern. From judgment for plaintiff, defendant appeals.

*Messrs. Abney & Muller,* for appellants, cite: *Is it duty of master not to permit his servant to work overtime?* 9 Fed. St., Ann., 463, 464; Stinson's Am. Con., 55, 66. *Servant here guilty of contributory negligence:* 77 S. C., 328; 81 S. C., 100; 78 S. C., 374; 128 N. C., 517; 39 S. C., 51; 87 S. W., 1052. *Appellant's requests should have been passed on:* 59 S. C., 310; 69 S. C., 539; 67 S. C., 199; 78 S. C., 401. *Assumption of risks applies here:* 61 S. C., 479; Lab. on M. & S., 969; Dresser's Emp. Liab., 357-8; 49 S. C., 12; 81 S. C., 348.

*Messrs. Nelson & Nelson* and *James S. Verner*, contra. *Mr. Verner* cites: *Working a servant without necessary rest is negligence:* 161 Ind., 393; 7 A. & E. Ann. Cas., 316; 29 L. R. A., 104; 75 S. C., 162. *Loss of sleep was proximate cause of injury:* 1 Strob., 525; 76 S. C., 204; 78 S. C., 384; 81 S. C., 338; 54 S. C., 498. *Deceased not guilty of contributory negligence:* 76 S. C., 204; 52 S. C., 324; 81 S. C., 100, 203; 80 S. C., 1, 226, 531; 77 S. C., 325; 58 S. C., 491. *Failure to charge appellant's requests not error:* 59 S. C., 307; 26 S. C., 204; 81 S. C., 510; 51 S. C., 311; 50 S. C., 425; 68 S. C., 428; 59 S. C., 310; 78 S. C., 400; 51 S. C., 312. *Assumption of risks is for jury:* 61 S. C., 478; 63 S. C., 575; 68 S. C., 68; 67 S. C., 290; 65 S. C., 195; 63 S. C., 575.

June 25, 1909. The opinion of the Court was delivered by

Mr. Justice Gary. This is an action by the plaintiff as administratrix of the estate of E. D. McCrary, deceased, to recover damages against Southern Railway Company and its employees, W. T. Wright, a conductor, F. L. Shillitto, a conductor, and O. F. McEachern, an engineer, for causing the death of said E. D. McCrary.

The following allegations are set out in the complaint: "That the death of the said E. D. McCrary was due to the joint and concurrent negligence, carelessness, wilfulness and wantonness of the defendants, Shillitto, McEachern, Wright and Southern Railway Company, in the following particulars, to wit: The careless negligence, wilfulness and wantonness of the Southern Railway Company, in requiring and permitting the said E. D. McCrary to act as flagman upon said train, and to go out as flagman on the trip upon which he was killed, when the company, through its agents in service, knew, or could have known, that the said E. D. McCrary was in such physical condition, owing to the want of sleep and rest, as to render him unfit to perform the duties

of flagman; in requiring the said E. D. McCrary to be and remain in the service of the defendant, with scarcely any sleep or rest, for such a length of time immediately preceding his death, as to completely exhaust his physical and mental powers, as to render him incapable of properly guarding himself, and the train upon which he was flagging, against the dangers incident to the operation of trains."

The defendants denied the allegations of negligence and wilfulness, and interposed the defenses of contributory negligence and assumption of risk.

The jury rendered a verdict in favor of the plaintiff for $9,500, and the defendant appealed.

The first exception is as follows: "It is respectfully submitted that the presiding Judge erred in allowing the plaintiff to introduce in evidence the entire rule book of the defendant company, whereas he should have allowed only such rules, contained in the book, as were indicated by plaintiff's attorneys as relied on by them, and as were relevant to the issues."

The following statements are set out in the record: "Mr. Nelson: We offer this rule book in evidence. Rule 99, page 24; Rule 589, page 115; Rule 590, page 115. Mr. Muller: If there are any other rules that counsel want to put in evidence, they should be indicated. The Court: The correct rule is to offer the whole book in, and to call special attention to rules that he desires to use at the present time. The principle set out in Norris against the Insurance Company is that he can introduce part of the whole; if he introduces part, you can introduce the whole. Mr. Nelson: We offer the book in evidence, and call attention to those particular rules. Mr. Muller: We note objection to the admission of the book generally, upon the ground that a great deal of it is necessarily irrelevant to the issue and tends to encumber the record and confuse the case. The Court: I think he can introduce the book and call attention to the rules that he wants; don't know how he can separate them, or get them

in any other way. 'Mr. Muller: We do not object to the rules that he has specially called attention to, but we object to the whole book. * * * Mr. Verner: The rule book of the company is in evidence, and there are other rules that we introduced yesterday that we would like to call attention to, and we will now read those rules, or read them in the course of argument. Mr. Muller: We would like to know what they are. Mr. Nelson: The whole book is in evidence; we can not call attention now to every rule we expect to use. Mr. Muller: It is impossible to handle the evidence of the defense until it is known what evidence will be relied on for the plaintiff. * * * The Court: If they read any rule that takes you by surprise, I will allow you to reply to it."

It does not appear that the plaintiff's attorney read any rule that took the defendant by surprise.

Furthermore, the question, whether testimony is relevant, must rest, necessarily, in large measure, within the discretion of the presiding Judge; and his ruling is not the subject of appeal, unless there has been an abuse of discretion, which has not been shown in this case.

The second exception is as follows: "It is respectfully submitted that the presiding Judge erred in refusing the motion for a nonsuit on the whole case, upon the grounds:

1. That there was no evidence tending to show any wilfulness or wantonness, nor any negligence, on the part of the defendants, or any of them, causing the death of plaintiff's intestate, or contributory thereto as the proximate cause, or a proximate cause thereof. 2. That the evidence admitted of no other inference than that plaintiff's intestate's own negligence contributed to his death as a proximate cause thereof, without which his death would not have occurred."

His Honor, the Circuit Judge, granted the motion, as to the cause of action for punitive damages, and made the following ruling as to the cause of action based upon negligence:

"The Court: I have listened with a great deal of interest to the arguments. My conclusion is based on the case of *Reed* v. *R. R. Co.* 'The testimony tended to show that Reed had mistaken the time, by reason of the fact that his watch had run down, but it likewise tended to show that this was caused by the defendant, through its conductor, in requiring or permitting Reed to operate his engine after he had been in the discharge of his duties for forty-two consecutive hours immediately preceding the collision, without rest, and for about twenty-seven or twenty-eight hours without anything to eat. This was evidence of negligence, and the first ground of the motion was properly overruled.' Now, it is not for me to say whether the evidence is sufficient to establish the point to be proved, but is there any competent evidence tending to establish it? I think, in this case, there is some evidence tending to establish that fact; I, therefore, think it proper to leave it to the jury to say whether the evidence shows that the defendant had been on duty for such a length of time as would render him incapable of discharging the duties of flagman; and, if so, was that such an act of negligence on the part of the defendant as would make it liable for the injury complained of, as the proximate cause of such injury? I think that is a question of fact—whether the evidence is sufficient to establish it or not is for the jury."

The appellant's attorneys contend that the plaintiff's testimony disclosed the following facts: "In the case at bar, when the motion for a nonsuit was made, it had appeared by the plaintiff's evidence in chief that the plaintiff's intestate was what is known as an 'extra' flagman—that is to say, a flagman without a regular run, getting work only when there was extra work to do, his work being necessarily intermittent and irregular, and he getting pay only for the time he is on duty; that on the morning of August 15, 1906, between 9 and 10 o'clock, he went out as flagman on an excursion train from Columbia to Walhalla, reaching Wal-

halla between 5 and 5 :30 in the afternoon, remaining there
ten or fifteen minutes and then returning to Columbia with
the empty train, riding between stations in the rear pas-
senger first-class coach, and arriving at Columbia between
5 and 6 a. m. on the 16th.   That under the rules of the
defendant company, in force at the time, McCrary having
been on duty for more than twelve hours, and having com-
pleted his run, was entitled to ten hours of rest, and had the
right to refuse to go out, if called, until he had had his ten
hours' rest. That on the morning of August 16th.at 6 o'clock,
McCrary, who had just reached home from his Walhalla
trip, was called to go out on an extra passenger train to
Asheville, but, as he had a right to do under the rules of the
company, he refused to go, on the ground that he had just
returned from a long trip, and he continued the rest he was
taking until between 9 and 10 o'clock the same morning,
when, in the emergency of a wreck on the road, and he
being the only extra flagman available, he was again called;
this time to go out on extra work train No. 748 (a wrecking
train), and he consented to go, and went.   That this wreck-
ing train on which McCrary went out, on the morning of
the 16th, was equipped with sleeping accommodations, and
with conveniences for cooking and furnishing meals to the
men, it being the fact that when such working trains go out
to meet such emergencies as wrecks they go prepared to
stay for several days, if necessary, and are equipped with
boarding and lodging accommodations.   That the wrecking
train reached Shelton, the scene of the wreck, between 3
and 4 o'clock on the afternoon of the 16th, and McCrary
with it; that the men slept, or had the opportunity to sleep,
a part of the night of the 16th, but that during the night,
and on the morning of the 17th, a message was received
for the wrecking train to return to Columbia on account
of another wreck at Monetta; that it did return to Columbia,
but on reaching Columbia it was found that they did not
have what was needed at the Monetta wreck, and the crew

were asked if they would not go back to Shelton, to finish cleaning up the wreck there, which they, including McCrary, consented to do, and did do, arriving at Shelton at about 4 p. m. on the 17th, and McCrary getting some sleep on the trip from Columbia back to Shelton. During his service with this wrecking train, from the morning of the 16th to the afternoon of the 17th, the plaintiff's evidence in chief, while showing that McCrary got some meals and some sleep, does not show that he got his meals regularly, and a reasonable amount of sleep, but neither does it show that he did not. That afternoon (the afternoon of the 17th) while lying on the outside of the track, several thousand feet south of the depot at Shelton, presumably asleep, with his shoulders between the crossties and his head, or a part of it, on the rail, freight extra 62 came along, going towards Columbia, and mashed off part of his head and killed him."

In the case of *Republic Iron and Steel Company* v. *Ohler,* 161 Ind., 393, 405, in speaking of the liability of a master to a servant, who had lost an eye by reason of stivers flying from an iron rod, which he was holding while it was being hammered, after the servant had been continuously on duty for forty-eight hours, the Court says: "It is not reasonable to assert that a man who had labored continuously for a period of forty-eight hours without sleep, or even for a much shorter time, is in his normal condition, or that he, under the circumstances, can properly exercise all of the faculties or sense with which he is endowed. The law of nature is inexorable in its demands. The cravings of hunger and nature's demands for sleep, or rest, must have consideration. A human being, deprived of sleep for the period which appellant was, becomes dull in intellect and apprehension, and, necessarily, must be more or less unmindful of his surroundings."

In the case of *Great Northern Railway Company* v. *Couture,* 7 A. & E. Ann. Cases, 14 Quebec K. B., 316, in speaking of the liability of the railway company to a brake-

man, who had been injured in coupling cars, after he had been on duty for forty-eight hours, the Court says: "The company was held liable to this extent, not upon the alleged ground of having used a defective system of coupling, nor for an excessive rate of speed in bringing the cars together, but for keeping the young man at work for an unreasonable length of time without sleep. The evidence in this respect established that he commenced work half-past six o'clock in the morning and worked until eight in the evening; that he commenced at two o'clock the following morning and worked until seven in the evening, when he went to his supper, but was called and set to work again at half-past nine in the evening, although he complained of feeling tired and ill, and he was kept at work until half-past three in the morning, when the accident happened. It could not be otherwise than that his bodily strength was at that time exhausted, and his mental faculties must have been rendered dull, and his powers of observation greatly weakened. * * * To exact the extra-hazardous risk of coupling the cars in this instance required a degree of supervision and care on the part of the railway company's officials, which they greatly . neglected, in compelling Couture to perform that work, at 3 o'clock in the morning, after a service of forty-eight hours, interrupted only by the breaks—one of six and one of two hours." (See also note to this case.)

In the case of *Pennsylvania Company* v. *McCaffrey,* 29 L. R. A., 104, 108, the Court, in discussing whether or not a railway is liable to an employee injured by reason of the absence from a train of part of the crew, who had gone for their meals, after being in service for nineteen hours without anything to eat, says: "Unless it be that a master has a right to require a servant to stand at his post of duty, without food or rest, for nineteen hours every day, Sundays included, and that such conduct is not a breach of duty to the public as well as to its other servants, it follows that the appellant in this case has not performed its duty towards

decedent, without which it is liable, if this negligence was the proximate cause of his death. That it was is clear. The law of nature is inexorable in its demands. The cravings of hunger must be appeased. The laws of humanity declare that every man fit to be a member of a train crew must have three meals, some rest, and eight hours of sleep a day. The appellee well says: 'Deprived of these requisites of intelligent life, a soldier becomes a coward; a workingman a drone.' Any being would lose his strength if worked a few months by the time schedule provided for this crew. Every statute and employer's rule is made in the presence of and subject to the laws of nature. Hunger, thirst and sleep are imperative; and when a schedule is made of nineteen consecutive hours of service on a train, and no provision is made by the company for their supply of food, it is understood that the employees must, of necessity, at times during the service, leave their places to get their meals. So that when the engineer and conductor left the train, after thirteen hours of service, on the day of the accident, to get their supers, it was in obedience to this law of nature, an overruling necessity, and was not, therefore, negligence on their part." These cases are in accord with our own case of *Reed* v. *Ry.,* 75 S. C., 162, 55 S. E., 218.

Accepting as correct the statement set out in the argument of the appellant's attorneys, it shows that there was testimony tending to show negligence on the part of the defendant, and that the evidence was susceptible of the inference that the plaintiff's intestate was not guilty of contributory negligence.

At the close of all the testimony the defendant's attorneys made a motion to direct a verdict in favor of the defendant, which was refused, and this is assigned as error by the third exception. What was said in discussing the second exception disposes of this question.

The remaining exceptions assign error on the part of his Honor, the presiding Judge, in failing to charge the several

requests therein mentioned. The following is set out in the record: "The presiding Judge makes the following statement, to wit: 'At the conclusion of the evidence in this case 'Mr. Muller handed up to the Court the defendant's requests to charge in writing. After he had argued a motion to the Court to direct a verdict, and the ruling upon that motion had been made, Mr. Nelson, one of the counsel for the plaintiff, asked Mr. Muller if he had any propositions of law, whereupon Mr. Muller replied that he had sent up some requests to charge to the Court, but the ruling of the Court on the different grounds had covered most of the points. The requests were not formally withdrawn and I did not read them, for the reason that I concluded that they involved questions that had been disposed of in discussing the five acts of negligence. The requests were not read, but were handed up, as above stated, to the Court, and they were not charged except as embodied in the general charge. I, therefore, hold that the requests, having been formally submitted to the Court, and not having been withdrawn, are proper to be inserted in the "Case with Exceptions" on appeal to the Supreme Court.' "

The statement of the appellant's attorney, that "the ruling of the Court on the different grounds had covered most of the points," caused the Circuit Judge to reach the conclusion that "they involved questions that had been disposed of in discussing the five acts of negligence." The action of the attorney constituted a waiver of the right to insist upon the requests to charge.

It is the judgment of this Court that the judgment of the Circuit Court be affirmed.