SCHWEIG v. CHICAGO, M. & ST. P. RY. CO.

(Circuit Court of Appeals, Eighth Circuit. July 29, 1914.)

No. 4101.

1. MASTER AND SERVANT (§ 228*)—MASTER'S LIABILITY FOR INJURY TO SERVANT—ASSUMPTION OF RISK—EMPLOYERS' LIABILITY ACT.

An employé of an interstate railroad company, who worked for more than 54 hours out of 57 hours, assumed the risk of injury by reason of his exhausted condition, and there can be no recovery for his death, due to such cause, under Employers' Liability Act April 22, 1908, c. 149, 35 Stat. 65 (U. S. Comp. St. Supp. 1911. p. 1322), unless the violation by the railroad company of some statute enacted for the safety of employés contributed to his death and exempted him from such assumption under section 4 of the act.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 670, 671; Dec. Dig. § 228.*

Assumption of risk incident to employment, see note to Chesapeake & O. R. Co. v. Hennessey, 38 C. C. A. 314.]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

**2. MASTER AND SERVANT (§ 94\*)—HOURS OF SERVICE ACT—RAILROAD "EMPLOYE."**

An employé, working about feedyards of an interstate railroad in helping to unload, care for, and reload stock which in course of shipment was unloaded there for food, water, and rest, who while riding on a switch engine, from one part of the yards to another, fell off and was killed, was not within Hours of Service Act March 4, 1907, c. 2939, 34 Stat. 1415 (U. S. Comp. St. Supp. 1911, p. 1321), which defines "employés," as used therein, to mean "persons actually engaged in or connected with the movement of any train," and the fact that he had been required or permitted to remain on duty continuously for more hours than prescribed therein did not constitute a violation of the act by the railroad company.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 159; Dec. Dig. § 94.\*

Hours of service of employés, see note to United States v. Houston Belt & T. Ry. Co., 125 C. C. A. 485.

For other definitions, see Words and Phrases, First and Second Series, Employé.]

In Error to the District Court of the United States for the District of Minnesota; Chas. A. Willard, Judge.

Action at law by Peter Schweig, administrator of the estate of Walter Schweig, deceased, against the Chicago, Milwaukee & St. Paul Railway Company. Judgment for defendant, and plaintiff brings error. Affirmed.

For opinion below, see 205 Fed. 96.

Ernest A. Michel, of Marshall, Minn. (Tom Davis, of Marshall, Minn., on the brief), for plaintiff in error.

F. W. Root and Nelson J. Wilcox, both of Minneapolis, Minn., for defendant in error.

Before SANBORN and CARLAND, Circuit Judges, and REED, District Judge.

CARLAND, Circuit Judge. This was an action brought by Peter Schweig, the father and administrator of the estate of Walter Schweig, deceased, to recover damages for the death of the latter, alleged to have been caused by the negligence of the railway company.

A verdict was directed for the company by the trial court, and this ruling is alleged as error. It was alleged in the complaint and admitted at the trial that the train of 30 cars of stock, in connection with which Schweig was working when he was killed, was an interstate train; that the cattle that were unloaded from it and then reloaded had come from outside the state, and were destined for points outside; that at the time of the accident the cars attached to the engine from which the deceased fell were cars that had come into Minnesota from another state, and with the exception of one thereof were destined to points outside the state. The facts as they appear in the record are substantially as follows:

The railway company has and maintains at Montevideo, Minn., extensive railway yards, and as a part thereof maintains stockyards where cattle are fed and watered, and loaded into and off its cars. To facili-

tate the loading and unloading of cattle in the yards, certain platforms have been constructed alongside the tracks; the floor of the platforms being level with the floor of the box cars.

Walter Schweig, 16 years of age, was employed by the railway company in working in and about said yards, and in and about one of said loading platforms forming a part of said stockyards. He assisted in loading and unloading cattle; assisted in taking up and putting down toeboards, being small platforms leading from the railroad car doors to the loading platform and used to prevent cattle from falling down between the platform and the car. He pulled down water troughs on said interstate cars, said troughs being made of iron and built into the side of the cars, so as to become a part of the same, and helped to place sand in the cars preparatory to shipment of live stock. He also loaded hay into said cars for the purpose of feeding the cattle therein.

Deceased and other employés were accustomed to ride on the engines of the company in going from place to place about the yards where their services were required. On the morning of October 1, 1911, the day of the accident, a train consisting of 30 cars of live stock arrived at Montevideo. The cattle were unloaded and driven into the pens for food, water, and rest, and the empty cars were taken to the storage yards by the switch engine.

At some time in the afternoon, it being then time, in usual course, to reload these cattle, the switch engine went into the storage yard, attached itself to 21 of those 30 empty cars, and hauled them to and spotted them at the chutes for loading. The reason why the whole 30 were not handled in the one movement was that there were only chutes enough to accommodate 21 cars at one time. When the 21 cars were loaded, the switch engine was attached to them for the purpose of taking them back to the storage yards, there to await the loading of the remaining 9 cars, which would make up the full original train of 30 cars for their further eastward journey. At this time three of the employés of the company, namely, Walter Schweig, the deceased, Charles Garrettsee, and Charles Yung, got onto the train to ride down into the storage yards. Later, while in the act of stepping over the coupling apparatus on the locomotive, Schweig fell off, and was run over and killed. There was testimony on the part of the plaintiff that Schweig was ordered to go down to the storage yards, but in the view we take of the case this becomes immaterial, as we think under the evidence that Schweig was not a trespasser in riding upon the engine. In approximately 57 hours next preceding the time of the accident, deceased had been on duty and working for the company 54 hours and 40 minutes. There was evidence that deceased had fallen asleep the previous night at 10:30, while standing up eating a sandwich. The only negligence alleged against the company was the act of permitting Schweig to so continuously work without rest.

[1] Plaintiff in error claims that Schweig fell from the engine by reason of being in a tired and exhausted condition, although there is no direct evidence that this was so, and it is very doubtful whether there was sufficient evidence to go to the jury upon this subject (S.

L., I. M. & S. Ry. Co. v. McWhirter, 229 U. S. 265, 33 Sup. Ct. 858, 57 L. Ed. 1179); but we do not determine this question. Looking at the case as presented by the record, regardless of the Hours of Service Act, and treating the case simply as one under the Employers' Liability Law (35 Stat. 65), it is clear that Schweig assumed the risk of injury by reason of the continuous hours of service, as he knew better than anybody else his own condition, and as to whether he was taking any risks in continuing to work in his then present condition, whatever it was. Therefore the verdict was rightly directed on this view of the case. It remains to consider whether the Hours of Service Act relieved Schweig of the assumption of risk. Section 4 of the Employers' Liability Act provides:

"Sec. 4. That in any action brought against any common carrier under or by their virtue of any of the provisions of this act to recover damages for * * * the death of any of its employés, such employé shall not be held to have assumed the risks of his employment in any case where the violation by such common carrier of any statute enacted for the safety of employés contributed to the * * * death of such employé."

[2] It thus appears that if Schweig was within the Hours of Service Act, and the violation of the terms of that act was the cause of his death, he did not assume the risk. Section 1 of the Hours of Service Act provides:

"That the term employés as used in this act shall be held to mean persons actually engaged in or connected with the movement of any train."

We are not now to consider whether Schweig was engaged in interstate commerce, for that is admitted; but the question is, Was he actually engaged in or connected with the movement of any train? In riding upon the engine, Schweig and the other employés had nothing to do with its operation or movement. Their work was entirely independent of this, and it seems clear that in performing the work, which the record shows that Schweig performed, he was neither within the spirit or the letter of the Hours of Service Act. He was neither engaged in nor connected with the movement of the train. Whether Schweig was tired and exhausted by reason of continuous service did not affect, and could not affect, the movement of the interstate train. This condition of the case left the rule in regard to the assumption of risk operative, and defeats a recovery by the personal representative of Schweig. Southern Railway Co. v. Crockett, 234 U. S. 725, 34 Sup. Ct. 897, 58 L. Ed. 1564.

Judgment below affirmed.