BRITTON v. WABASH RAILWAY CO.

1. MASTER AND SERVANT — RAILROADS — INTERSTATE COMMERCE — QUESTION FOR JURY.

In an action by a railroad shop employee for injuries inflicted by one of defendant's trains, testimony that plaintiff made repairs on locomotives that were used for both freight and passenger trains through different States presented a question for the jury as to whether he was engaged in interstate commerce rendering applicable the provisions of the Federal employer's liability act (35 U. S. Stat. p. 65.)[1]

2. EVIDENCE—MENTAL AND PHYSICAL CONDITION OF ONE WORKING 14 HOURS A DAY COMMON KNOWLEDGE.

That a person working from 14 to 16 hours a day would not, at the end of a working period, be in a normal condition, that his bodily strength would necessarily be exhausted, and his mental faculties dulled and weakened, rendering him less able to protect himself from danger, is a matter of common knowledge.[2]

3. MASTER AND SERVANT—NEGLIGENCE—PERSONAL INJURIES—LIABILITY OF MASTER WORKING 18-YEAR OLD BOY 14 HOURS A DAY QUESTION FOR JURY.

Whether a railroad company, in keeping an inexperienced

---

[1]Master and Servant, 26 Cyc. p. 1459; [2]Evidence, 23 C. J. § 1810.

As to effect of overwork of servant as affecting master's liability for injury to him or another servant, see notes in 13 L. R. A. (N. S.) 1214; 45 L. R. A. (N. S.) 372.

On necessity that injury to child proximately result from his employment in violation of statute, see notes in 1 B. R. C. 634; 48 L. R. A. (N. S.) 661.

18-year old boy at work in its shops continuously from 6 o'clock in the morning until 11:15 at night, when he was injured while trying to cross its tracks to reach a restaurant for the purpose of getting his midnight meal, when he was to continue his work, was guilty of negligence rendering it liable for said injuries, in view of the fact that it had knowledge of his age and inexperience, and that it was the custom of its employees to cross its tracks for said purpose, was a question for the jury.[3] Clark, Steere, and Wiest, JJ., dissenting.

Error to Lenawee; Hart (Burton L.), J. Submitted October 15, 1924. (Docket No. 102.) Decided April 24, 1925. Rehearing denied June 18, 1925.

Case by Hugh L. Britton, an infant, by his next friend, against the Wabash Railway Company for personal injuries. Judgment for plaintiff. Defendant brings error. Affirmed.

*Baldwin & Alexander*, for appellant.

*B. D. Chandler*, for appellee.

Sharpe, J.    There was a general strike of the employees of the defendant in the summer of 1922. Hugh L. Britton (hereinafter called the plaintiff), a young man 18 years of age and weighing about 135 pounds, sought and obtained employment in its machine shops at Montpelier, Ohio.    He had theretofore lived on a farm 9 miles from a railroad station, and had ridden on trains but twice and for short distances.    He informed the superintendent who hired him that he had had no experience in such work.    His wages were fixed at 70 cents an hour for the first 8 hours of each day and $1.05 per hour for overtime. He began work the next day (July 8th), and worked until the night of August 3d.    The shops were on the south side of the railroad, almost directly across from

[3]Master and Servant, 26 Cyc. p. 1471.

the depot.    Fifteen tracks separated them.    The de-
fendant had provided a bunk room for its employees
to sleep in and cars in which meals were served with-
out charge.    These meals were furnished at 6 in the
morning, 12 noon, 6 in the evening, and 12 midnight.
There was a restaurant near the shops on the same
side of the tracks at which plaintiff had got his dinner
the first two days he was at work, but the proprietor,
by the signs he had put up and in other ways, had
indicated his sympathy with the strikers, and plaintiff,
as he claims, was told by the superintendent that he
must not get his meals there; if he did, he would lose
his job.    There was another restaurant on the rail-
road property, near the depot.    A viaduct had been
constructed by the city over the tracks near the
machine shops.    This was the usual way to go from
the shops to the depot.    While crossing this viaduct
at one time plaintiff was stopped by the strikers.    He
reported this to the superintendent, who said—

"we should stay off the viaduct and not go across there,
and save trouble.    Mr. Helm said that if we had oc-
casion to cross those tracks to go right across them,"
and "I received instructions from Mr. Helm to remain
on railroad grounds."

Guards had been placed there to protect railroad
property.    The employees in the shops were not satis-
fied with the meals furnished them by the company,
and made complaint about them.    Britton testified
that he got about one-third or one-half of his meals
at the restaurant across the tracks, as did many of
the other men, and that they were several times seen
while eating by the foreman of the shops, and that
the superintendent said "that if we wanted anything
from over there at the restaurant to go across the
tracks and get it."

Plaintiff worked 23 days for the defendant.    It is
his claim, based on his earnings, that he worked

16 2/7 hours out of every 24 during that time, while defendant's records showed an average of 14 20/23 hours. During the three days preceding midnight of August 3d, plaintiff claims he worked on an average 18 hours each day, while defendant's records showed he worked 16. He also testified that he "frequently worked there as high as 36 hours at a time, without rest or sleep." It is plaintiff's claim that he worked these long hours because requested to do so by the foreman, on account of the scarcity of men, and that he felt he must do so to hold his job. He testified:

"When I would go into the roundhouse there at night about 7 o'clock and didn't have any intention of working, Mr. Moran and Mr. Meyers both have told me if I would go to work my time would go right on from 6 o'clock, when I quit to eat supper. Mr. Moran was general foreman and Mr. Meyers was house foreman, at night. John Harp was master mechanic, and Mr. Helm was superintendent."

The effect of these long hours of work is thus described by him:

"These long, continuous hours of service without rest or sleep made me dull and sleepy, and I was tired, and have gone to sleep while I was working. On one occasion I was told to work on a certain engine by either Mr. Meyers or Mr. Moran, and I went to work on an engine and he came along and hollered to me and wanted to know what I was doing. I told him I was fixing it, and he said, 'You have got the wrong engine and are doing the wrong work on it.' Then I went to the engine. He roused me up a little, I guess, and I went to the engine and done what I was supposed to do."

On August 3d, plaintiff began work at 6 in the morning and worked continuously until 11:15 at night. He had then completed the job he was at. Work after midnight had been assigned to him by the foreman. In company with a young man of about his

age, who was working with him, he started to cross the tracks to get his midnight meal at the restaurant. There was a string of flat cars on one of the side tracks. Plaintiff took hold of the ladder on the side of a car, intending to pass over the bumpers between the cars, when the cars started to move. He thus describes what occurred:

"I was at the end of the car on the ladder and did not have any warning of any kind that the train was going to start, and did not hear or see any signals of any kind that it was about to start, and Mr. Beyers was on the car next to me. The cars started west. I knew they were on a side track and the cars got to going at about a speed of ten to twelve miles an hour, and stopped very suddenly, so suddenly that it throwed me loose from the ladder and I fell to the ground, and the wheel ran over my hand and fingers. When the cars stopped so suddenly they came apart or broke apart."

This action is brought to recover damages for the injury thus sustained under the provisions of the Federal employers' liability act (35 U. S. Stat. p. 65 [8 U. S. Comp. Stat. § 8657 *et seq.*]). A verdict and judgment in his favor for $5,000 is here reviewed by defendant by writ of error.

1. It is insisted that there was no sufficient proof that plaintiff was engaged in interstate commerce to justify the submission of that question to the jury. One of plaintiff's witnesses testified:

"I know the Wabash ran through Ohio, Indiana, and Michigan, and locomotives that Hugh and myself and others made repairs on were used for both freight and passenger trains through these different States."

No proof was offered by the defendant as to whether the work in which plaintiff was engaged was interor intrastate. In its motion for a directed verdict at the close of plaintiff's case, and again at the close of the proofs, no claim was made that the proofs did

not sufficiently show that plaintiff was engaged in interstate commerce.   A somewhat similar question was before this court in *Collins* v. *Railroad Co.*, 193 Mich. 303.   The authorities were there considered and discussed by Mr. Justice MOORE.   The question was for the jury.

2. It is insisted that no negligence on the part of the defendant was established.   While plaintiff made several claims in this respect, the court submitted to the jury but one, and in the following language:

"*Fifth.*   There is a claim on the part of the plaintiff that defendant was negligent in overworking him. This is the only claim of negligence that you can consider under the proofs in this case.

"Then you are instructed if you find under the evidence in this case that defendant, before the injury, knowingly permitted plaintiff to work more hours and in such a manner than an ordinarily prudent person would have permitted under similar or like circumstances, or if the defendant, by the exercise of ordinary and reasonable prudence, should have known that plaintiff was working more hours and in such a manner than an ordinary, reasonable, prudent person would have permitted, and as a result of said work plaintiff became, at the time of the injury, worn down in mind and physical strength, rendering him unfit to perform his duties in a reasonably prudent manner and to appreciate the dangers incident to his employment as an ordinarily prudent person would perform and appreciate them, and defendant knew that this overwork would produce lack of ordinary mentality and physical strength in plaintiff, or by the exercise of ordinary and reasonable prudence defendant should have known it, this would be negligence on the part of the defendant, and if this negligence was the proximate cause of plaintiff's injury, plaintiff can recover, unless this was an assumed risk incident to the employment."

The only employment in which plaintiff had theretofore been engaged was in assisting his father in the work upon the farm.   His age and inexperience were

known to defendant's superintendent and foremen. They knew that he and other workmen were crossing these tracks to reach the restaurant and that strings of box cars were on the tracks and that, to reach the opposite side, the men must cross over them. Under the proofs we think the jury might well have found that the men were in the habit of crossing over them, as plaintiff was endeavoring to do at the time he was injured, and that their doing so was known to the superintendent and men under whom they worked.

The effect upon the human system of such long, continuous hours of service must be considered a matter of common knowledge. A person who so works is not, at the end of the period, in a normal condition. His bodily strength necessarily becomes much exhausted, and his mental faculties cannot but be dulled and weakened. His condition renders him not only unable to protect himself from danger, but more or less unmindful of his surroundings. He does not see things that he would otherwise observe, nor does he fully appreciate the danger of the things he does see. His conduct must be viewed in the light of his then condition of body and mind. A doctor called by plaintiff testified that—

"A boy 17 or 18 years of age, working that many hours without sleep and rest, would not be a normal individual. He would be in a dazed condition."

Had the plaintiff been an adult, there would be much force in defendant's contention that he knew his condition better than the defendant did, although much reasoning may be indulged in to the contrary. This was the first service, aside from his farm work, which the plaintiff had rendered. He was receiving compensation for work done by him for the first time. The increased pay for overtime doubtless appealed to him. He testified that he was earning about $14 per day. There can be no doubt that he was urged,

although not compelled, to work these long hours. What plaintiff was attempting to do in crossing between the cars, if not done with the approval, was certainly with the tacit acquiescence of those under whom he was working.

After due consideration, we are impressed that the instruction above quoted was justified by the proofs. The question is a novel one, and there appears to be but little authority bearing upon it. In *Great Northern R. Co.* v. *Couture*, 14 Quebec K. B. 316 (7 Ann. Cas. 190), it was held (we quote from the syllabus):

"A master who keeps his servant continuously at work for an undue number of hours is liable in damages for an injury which the servant sustains, in the ordinary discharge of his duty, in consequence of his inability, from fatigue and exhaustion, to use the requisite skill and care."

In the opinion the age of the person injured is not stated. He was, however, employed as a brakeman, and it may be inferred that he had, at least, reached the age of the plaintiff in this case at the time of his injury. As to his hours of work, it is said:

"The evidence in this respect established that he commenced work at half-past 6 o'clock in the morning and worked until 8 in the evening; that he commenced again at 2 o'clock the following morning and worked again until 7 in the evening, when he went to his supper, but was recalled and set to work again at half-past 9 in the evening, although he complained of feeling tired and ill, and that he was kept at work until half-past 3 in the morning, when the accident happened."

The court said:

"It could not be otherwise than that his bodily strength was at that time exhausted and that his mental faculties must have been rendered dull and his power of observation greatly weakened."

And further:

"It is true that the plaintiff alleged that the immediate and direct cause of the accident was the use of a defective and dangerous system of coupling, but he added that the accident happened in the middle of the night, when the victim was exhausted by excess of labor, after having been kept 48 consecutive hours on duty—that is, that young Couture's exposure to an accident from defective couplers was aggravated by his condition of exhaustion for which the railway company was responsible."

In *Pennsylvania Co. v. McCaffrey*, 139 Ind. 430 (38 N. E. 67, 29 L. R. A. 104), a train crew were kept on duty for 19 hours each day without time for rest or food. The conductor and engineer left the train to procure food. The plaintiff, a section hand, was injured while the locomotive was being operated by the fireman alone. It was held that the company was chargeable with notice that the conductor and engineer—

"must, and therefore did, at intervals during the nineteen hours of each day, leave the train to answer nature's strong and eager desire for food. And so knowing, it will be held to have consented."

It was further held that the operation of the locomotive by the fireman alone was a negligent act, chargeable to defendant, and that the fellow-servant rule did not prevent plaintiff's right to recover, nor did he assume the risk incident thereto.

"It is not reasonable to assert that a man who has labored continuously for a period of 48 hours without sleep, or for even a much shorter time, is in his normal condition, or that he, under the circumstances, can properly exercise all of the faculties or senses with which he is endowed. The law of nature is inexorable in its demands. The cravings of hunger and nature's demand for sleep or rest must have consideration. A human being deprived of sleep for the

period which appellee was becomes dull in intellect and apprehension, and necessarily must be more or less unmindful of his surroundings." *Republic Iron & Steel Co.* v. *Ohler,* 161 Ind. 393, 405 (68 N. E. 901).

"The testimony tended to show that Reed had mistaken the time, by reason of the fact that his watch had run down, but it likewise tended to show that this was caused by the defendant, through its conductor, in requiring or permitting Reed to operate his engine, after he had been in the discharge of his duties for 42 consecutive hours immediately preceding the collision, without rest, and for about 27 or 28 hours without anything to eat. This was evidence of negligence, and the first ground of the motion was properly overruled." *Reed* v. *Railway,* 75 S. C. 162, 172 (55 S. E. 218):

The rule thus stated is approved in *McCrary* v. *Railway,* 83 S. C. 103 (65 S. E. 3, 18 Ann. Cas. 840), where *Pennsylvania Co.* v. *McCaffrey, supra,* is quoted from at length.

"A street car company which knowingly places in charge of a car a motorman who is incapacitated for such service from overwork and loss of sleep cannot avoid liability for injury to his coservant by his failure to observe a rule of the company, where such failure was due to his condition." Syllabus, *Fort Wayne, etc., Traction Co.* v. *Crosbie,* 169 Ind. 281 (81 N. E. 474, 13 L. R. A. [N. S.] 1214).

See, also, *Adams* v. *Railway Co.,* 73 W. Va. 698 (80 S. E. 1115, 52 L. R. A. [N. S.] 175, 177), hereafter quoted from.

3. It is urged that plaintiff assumed the risk incident to what he was doing at the time of his injury. The reasoning under which the foregoing instruction was approved we think sufficiently answers this claim. A similar claim was made in *Adams* v. *Railway Co., supra.* The injured workman in that case was 17 years of age. The court said:

"If there was any failure of duty on the part of the defendant, it was the omission of warning and notice

of danger from working at night, after a full day of wakefulness, in which seven or eight hours' work had been done. In the case of an adult this danger would be regarded as an ordinary one necessarily, for it would have been as well known to the servant as the master. It is a danger within the common knowledge of ordinary men, and there is no ground upon which it can be said an adult servant does not know and appreciate it as fully as the master. But, in the case of an infant servant, ordinary risks are conditional. In other words, they are not ordinary risks, but extraordinary ones, unless it appears that in some way the servant had knowledge of them and appreciated them. It does not appear that the deceased had ever before worked at night on a railroad track, or elsewhere, so as to make it apparent from his experience or observation that the numbing effect of fatigue and loss of sleep would increase the danger of injury. If such experience had been shown, the court could say as matter of law he assumed the risk. *Williams* v. *Belmont Coal & Coke Co.*, 55 W. Va. 84 (46 S. E. 802). In the absence of such proof, or something else showing knowledge and appreciation of the particular danger, the law imposes upon the master duty to warn and instruct a minor servant as to it."

4. Counsel insist that the verdict is excessive. We are not inclined to discuss this question in view of what has been said in recent cases. We find no justification for reducing it or setting it aside.

The other errors assigned have received due consideration. In our opinion they are without merit.

The judgment is affirmed.

McDonald, C. J., and Bird, Moore, and Fellows, JJ., concurred with Sharpe, J.

Wiest, J. (*dissenting*). I am not in accord with the opinion prepared by Mr. Justice Sharpe. Defendant's motion for a directed verdict should have been granted. Recovery was had under the Federal employers' liability act. This presents a Federal

question.    In actions under the Federal employers'
liability act the doctrine of assumption of risk remains
as at common law, except as to fellow-servants and in
case of violation of a Federal statute enacted for
the safety of employees.    *Southern Railway Co.* v.
*Crockett,* 234 U. S. 725 (34 Sup. Ct. 897) ; *Boldt* v.
*Railroad Co.,* 245 U. S. 441 (38 Sup. Ct. 139) ; *Chapman* v. *Railroad Co.,* 196 Mich. 671; *Sims* v. *Railway
Co.,* 196 Mich. 114.

Upon the question of when the employee assumes the
risk under the Federal act, decisions of the Federal
courts control.    *Southern Railway Co.* v. *Gray,* 241
U. S. 333 (36 Sup. Ct. 558).

The risk plaintiff encountered was obvious and
recognized by him.    His inexperience does not excuse
him in ignoring a danger apparent to him.    He was
18 years of age, presumed as capable as an adult to
assume risks of employment, and in fact was well
aware of the possible danger attending the act in
which he was injured.    He assumed the risk.    *Martin*
v. *Detroit Lumber Co.,* 141 Mich. 363.    The plaintiff not only assumed the risk but his evidence establishes beyond peradventure that he was aware of
his sleepy and dull mental condition and of his physical
weariness.    Defendant, if aware of plaintiff's condition, could have given him no warning thereof that
he did not himself possess.

For the purposes of this opinion, it may be conceded that plaintiff at the time he was injured was
engaged in interstate commerce, and was injured because of want of alertness arising from long hours
of labor without adequate rest.

Plaintiff's own testimony brings this case within
the holding in *Schweig* v. *Railway Co.,* 132 C. C. A.
660 (216 Fed. 750, 7 N. C. C. A. 135).    In that case
plaintiff's decedent was 16 years of age and employed
by the railway company in working about its yards.

He was accustomed to ride on engines in going from place to place where his services were required. While so on an engine and in the act of stepping over the coupling apparatus, he fell off and was run over and killed. The action was under the Federal employers' liability act.

The court stated:

"There was testimony on the part of the plaintiff that Schweig was ordered to go down to the storage yards, but in the view we take of the case this becomes immaterial, as we think under the evidence that Schweig was not a trespasser in riding upon the engine. In approximately 57 hours next preceding the time of the accident, deceased had been on duty and working for the company 54 hours and 40 minutes. There was evidence that deceased had fallen asleep the previous night at 10:30, while standing up eating a sandwich. The only negligence alleged against the company was the act of permitting Schweig to so continuously work without rest.

"Plaintiff in error claims that Schweig fell from the engine by reason of being in a tired and exhausted condition, although there is no direct evidence that this was so, and it is very doubtful whether there was sufficient evidence to go to the jury upon this subject (*St. Louis, etc., R. Co.* v. *McWhirter*, 229 U. S. 265 (33 Sup. Ct. 858)'; but we do not determine this question. Looking at the case as presented by the record, regardless of the hours of service act, and treating the case simply as one under the employers' liability law (35 U. S. Stat. p. 65) it is clear that Schweig assumed the risk of injury by reason of the continuous hours of service, as he knew better than anybody else his own condition, and as to whether he was taking any risks in continuing to work in his then present condition, whatever it was. Therefore the verdict was rightly directed on this view of the case."

See, also, *Furlow* v. *United Oil Mills*, 104 Ark. 489 (149 S. W. 69, 45 L. R. A. [N. S.] 372).

Plaintiff was anxious to earn the wages paid for long hours of employment and knowingly taxed his

mental and physical powers of endurance beyond what he should.   But this, if it was known to defendant or should have been discovered, was equally known to plaintiff, and bars him from pleading such condition in release of assumption of risk.

In order to fully understand this case it is necessary to state at considerable length the testimony given by plaintiff.

Plaintiff testified:

"These long, continuous hours of service without rest or sleep made me dull and sleepy, and I was tired, and have gone to sleep while I was working.   *   *   * I knew that I was sleepy and that I was putting in long hours.   I knew that loss of sleep was causing my condition.   I was aware of my condition, that I was sleepy and dull and tired.   I knew of these things all the time that I was working there, and knew it when I went out there to go across those cars, I was some sleepy.   I did not realize or appreciate my condition fully at that time.   *   *   *   I knew that there was a danger to climb over or crawl under a train of cars.   I didn't think much about it at the time. After the train started I could have jumped off and if I had, I don't suppose this particular accident would have happened.   I thought it was safer to stay on to the train than it was to risk jumping off.

"*Q.* *   *   *   You just simply took the chance there.   Instead of getting off when that train started, you just simply took the chance of riding down a little farther so it would bring you nearer that restaurant, and then when the train stopped suddenly it jerked you off and you got hurt.   Now, that was the situation, wasn't it?   Is that right?

"*A.* I stayed on the train.   Yes, sir.

"*Q.* And that is the reason that this accident happened, is because you took that chance, wasn't it?

"*A.* Yes, sir.   *   *   *   If I went across to the restaurant to get my meals I had to pay for them, and if I got my meals at the Wabash where they were furnished, they didn't cost me anything.   I knew that the Wabash wasn't going to pay for meals that I got over at the restaurant.   I bought my meals on my

own hook, but I was paid for the time it took me to go across and get my meals and come back.   *   *   *

"All the time I was there from July 8th up to August 3d, I was crossing these tracks quite frequently and there were always freight trains on those tracks. Those trains were being moved on the main track and on sidetracks and I knew that the cars were moved back and forth although they had never been moved when I was going across.    This night in question when I went out there I didn't notice the engine.    I looked both ways, I am sure I looked both ways to see.    The reason I looked both ways to see whether there was an engine attached to the string of cars or not was that I didn't want to go onto it and have it start up with me.    I was that careful at that time. My brain was perfectly clear enough that I looked to see that the cars wasn't moving and looked to see if there was an engine hooked on to them.    I knew that it was dangerous to get onto cars if they was moving, or to get onto cars if they was going to move. I say I looked to see if an engine was attached to this particular string of cars, but I didn't notice the engine.    I think the bell was ringing.    I think they ring the bell when they are going to move, but I have seen them out there dumping cinders when the bell was ringing nearly all the time.    This locomotive was not on the cinder bed, the locomotive was to the east, and I heard the bell ring.    I suppose if I had walked up there and took a look I would have known that that engine was attached to that string of cars. I didn't walk up there to look.    I made up my mind that I would crawl over those cars and go over to the restaurant, I had never had interference going across there, and I didn't think of the cars moving. I knew it would be dangerous if the train started when I was on it.   *   *   *    On the day I was hurt I had taken my dinner and supper at the commissary.    I had part of my meals there all the time and a part across the track to the restaurant.   *   *   *    The yards extend east and west from the shops and there were twelve or fourteen tracks, main and sidetracks, between the shops and the restaurant.   *   *   *    It wasn't absolutely necessary for the employees to leave the shops for any purpose whatever unless they saw fit to go over here to this restaurant to get a meal.

* * * I was never told that if I didn't do extra work that I would be discharged, or anything of that kind.   I thought it was an accommodation to them and it also earned me more money.   I didn't think that the amount of work that I was doing was injuring me.   I think I am a good, intelligent young man, and have a country school education.   I can say that I did not realize the condition I was in and appreciate it.   I knew I was sleepy and I knew I was tired, but that is as far as my thoughts went about it. * * *

"Q. And so far as you know, no Wabash man or employee knew that you and the other boy were on that train when it started?    Is that correct?

"A. Yes, sir.   After I was injured I was taken in the roundhouse and Mr. Moran and Mr. Meyers were there.   I think they inquired of me as to how I got hurt and I said I didn't feel like talking.   The boy with me was Clair Beyers.   I think I told Clair Beyers not to tell the Wabash men how I got hurt. The reason I didn't tell the foreman how it happened was that I didn't feel like talking.   I didn't want Beyers to tell it.   He didn't know how it happened and I didn't know what he would tell.   I told him not to say anything about it. * * * At the time I crossed that yard that night and on every other occasion I used the best care I could think of.   I never received any warning of any kind by any of the supervisors there of the Wabash as to the danger of crossing the tracks or going between cars or anything like that. * * * The night in question I got through my job I was working on before 12 o'clock. I got through at 11:15 or somewhere there so I had three-quarters of an hour between when I had finished my job and supper time at the commissary, and instead of waiting for the commissary lunch the other boy and I started to go across to the restaurant."

I find nothing in this case relieving plaintiff from the risk he says was known to him at the very time of the accident.   He was fully aware of the danger he would encounter if the train started; he heard the bell ring its warning, yet he proceeded to pass over the cars, and the train started, and the very danger

he apprehended was upon him. Plaintiff was old enough to and did fully appreciate the danger incident to passing over the standing train. Was he so sleepy and exhausted by long hours of labor as to be rendered indifferent to ordinary care for his safety? His testimony refutes any such idea. But he says he was not given instruction about care to be exercised. What need had he for instruction about care to be taken? He was fully aware of the care he should have exercised to avoid the known danger.

Plaintiff's claim that he did not appreciate his mental and physical condition at the very time of the accident does not help him, or place the risk he assumed upon defendant. He was aware of his condition and should have employed such knowledge in his own behalf. He cannot be heard to say that defendant should have discovered what he knew about himself, and have acted as his mentor, and saved him from a danger he recognized, and, after recognition, encountered voluntarily.

I have examined the cases cited by my Brother, but space forbids review thereof. Of the cases so cited, those nearest the mark placed liability on the ground that the employer exacted services of an employee when the latter was incapacitated from performance of duties by reason of loss of sleep and physical exhaustion. The testimony of plaintiff forbids application of any such principle to this case, or to reason by analogy from such holdings that there was actionable negligence in this instance. If plaintiff's testimony is held to show actionable negligence the holding will be far-reaching in effect, will not fall within any principle of negligence known to date to the law, common or statute, abrogate the rule of assumption of risk, and admit of a designing plaintiff capitalizing his own inattention to ordinary risks.

So far I have considered the case on the theory

that plaintiff at the time of the accident was engaged in interstate commerce and, therefore, the Federal employers' liability act applies.    I am of the opinion, however, that when plaintiff was through with his work that night, even if his work was in interstate commerce (of which there is no sufficient evidence), when he started to get his lunch elsewhere than where provided by the terms of his employment he was not engaged in interstate commerce, but was about his private affair wholly divorced from any relation to his employment.

I am also satisfied there was no negligence of which plaintiff can complain in the sudden stopping of the cars.    His presence was not known to any one operating the train.    This claim I understand is abandoned, and I only mention it because of the provision in the Federal employers' liability act, saving one from assumption of risk, when injured through the negligence of fellow-servants.

The judgment should be reversed with direction to the circuit court to enter judgment for defendant. Defendant should have costs.

CLARK and STEERE, JJ., concurred with WIEST, J.