# CHARLESTON.

WILLIAMS, ADM'X v. BELMONT COAL & COKE Co.

Submitted February 10, 1904. Decided February 23, 1904.

1. SERVANT—*Trespass.*

One who enters upon the premises of another as a servant of the proprietor for the purpose of performing labor thereon for the proprietor, whether in pursuance of a contract with the owner of the property or as the servant of an independent contractor engaged in the performance of work thereon, is not a trespasser nor a mere licensee. He is deemed to be upon the premises by invitation of the owner who owes him the duty of keeping the premises in a reasonably safe condition. (p. 92).

2. TRESPASSER.

A person so' entering upon the premises of another, however, does so subject to the doctrine, *volenti non fit injuria*, and takes upon himself the risk of all dangers attendant thereon of which he has knowledge. (p. 92).

3. TRESPASS—*Knowledge of*.

The principle of the assumption of known risks and dangers is applicable to minors, when there is specific and positive evidence showing that the risk in question was comprehended. (p. 92).

4. TRESPASS—*Negligence*.

A dark tunnel, leading through a hill to a coal mine in another hill back of it, used by the owner of the mine for hauling coal from it, by means of an electric motor, and also by the miners in going to and returning from their work in the mine, with the knowledge and consent of the owner, and as the usual and customary way of ingress and egress, is a place in respect to which the owner of the mine owes to his employees the duty of ordinary care for their safety when, so using it. (p. 92).

5. DAMAGE—*Negligence*.

A boy of fifteen and one half years old and of at least ordinary intelligence who had worked with his father in such mine and had passed through such tunnel in going to and returning from his work on several successive days and started alone through such tunnel, after having been warned by the father to be careful, and, while passing through it, was run over and killed by the motor, must be deemed to have assumed the risk attendant upon such palpably dangerous undertaking. (p. 94).

6. NEGLIGENCE.

A minor who enters the employ of another assumes the risks of all such apparent dangers as he is capable of comprehending and avoiding and in a suit against his employer because of his death by reason of the alleged negligence of his employe, it must be shown that his death was occasioned by negligence on the part of the employer other than such apparent danger. (p. 94).

7. SYLLABUS APPROVED.

Points 3, 4 and 5 of syllabus in *Ketterman* v. *Railroad Co.*, 48 W. Va. 606, approved and applied. (p. 94).

8. WITNESS—*Relevancy*.

If an exception, for allowing or refusing to allow a question to be answered by a witness, fails to give the answer of the witness, or what is expected to be proved by him, the appellate court cannot determine the relevancy, admissibility or value of the answer, and for that reason the exception will not be considered by it. (p. 96).

Error to Circuit Court, Kanawha County.

Action by Elizabeth Williams, administratrix, against the Belmont Coal & Coke Company. Judgment for defendants, and plaintiff brings error.

*Affirmed.*

PAYNE & PAYNE, A. B. LITTLEPAGE, and L. D. VICKERS, for plaintiff in error.

BROWN, JACKSON & KNIGHT, for defendant in error.

MILLER, JUDGE:

Eugene Williams was killed in a tunnel, adjacent to, and connected with, the defendant's coal mines. Elizabeth Williams, his executrix, brought her action in the Circuit Court of Kanawha County to recover $10,000 damages for the alleged negligence of the defendant, which, as she claims, resulted in the death of decedent, her son.

Upon the trial of the case, in the circuit court, the defendant, without introducing any testimony, demurred to the plaintiff's evidence. The court sustained the demurrer and rendered judgment for the defendant. To that judgment a writ of error was awarded. The plaintiff insists, as the principal ground of error, that the trial court should have submitted the evidence to the jury empaneled in the case.

The declaration contains two counts. The first, among other things states that, on the 22d day of January, 1900, the day on which the deceased was killed, the said Eugene Williams was engaged to work for his father, Augustus Williams, who was then and there employed by said defendant as a coal miner, at its coal mines. This count then alleges as follows: "The plaintiff avers, that on the day and year last aforesaid, while the said Eugene Williams was rightfully and lawfully in the said entry to the mines of the said defendant, and on the defendant's said railroad which passes through said entry, the said defendant, by its servants so carelessly, negligently and improperly conducted themselves in and about the management, control and direction of the motor, cars and carriages, so used on said railroad, that the same by and through the fault, carelessness, negligence and improper conduct of the servants of said

defendant, then and there about three hundred feet from the drift mouth of said entry, with great force and violence were driven and struck against the said Eugene Williams, whereby he, the said Eugene Williams, was cut into pieces and killed."

The second count, without averring any employment of the father by the company, charges that the defendant "was the owner of a certain railroad, to-wit: a railroad extending from its tipple at its mines in the said county of Kanawha on, to and through its main entry to its mines, and of certain motors, engines, railroad cars and carriages operated under the care and management of certain servants of said defendant, nevertheless the said defendant, by its said servants, so carelessly, negligently and improperly behaved and conducted itself in and about the management, control and direction of said railroad, motors, engines, cars and carriages, that the same by and through the default, carelessness, negligence and improper conduct of the said servants of the said defendant, then and there, at the county of Kanawha aforesaid, with great force and violence, were driven and struck against the said Eugene Williams by means whereof, he, the said Eugene Williams, was then and there, at the county of Kanawha aforesaid, knocked down and killed." The evidence discloses that the mines and other works of the defendant were separated by what is called Dry Branch; that the company's coal tipple is on the Kanawha River; that between the river and Dry Branch, there is a mountain which, in the record, is designated as the front mountain; that beyond Dry Branch is another mountain, in which are the company's coal mines; that from the mouth of the mines, there is a trestle across Dry Branch; thence a tunnel through the front mountain to the coal tipple, and also to the river; and that about six hundred feet from the Dry Branch entrance of the tunnel, toward the river, the tunnel forks, the left hand branch turning into another chamber, and going to the coal tipple, and the other branch, continuing to the river entrance, a distance from the Dry Branch entrance of about 2,800 feet. From the mouth of the mines across the trestle, through the tunnel, to the tipple, the company had its haulage track, over which it carried its coal in cars, as it was taken from its mines. The coal cars were drawn by an electric motor, which would take out a number of loaded cars from the tressel, through the tunnel to the

tipple, and return with another train of empties. The latter would then be left on the trestle, and a train of loaded cars made up for the motor, the trestle being used for that purpose. It required about half an hour to make up a load on the trestle, and about the same length of time for the motor to then make a round trip to the tipple. At the Dry Branch entrance to the tunnel there was a trap door, which, at the time of the death of Williams, was in charge of a boy. What his duties were, are not stated in the evidence. It is also shown that the miners would go through this tunnel from the river to the mines in the morning, and return through it in the evening on their way home after the close of their day's work; but it is also proved that their passage through the tunnel was not necessary to enable them to reach the mines, as there was a pass way across the mountain from the river to Dry Branch. It appears that, at certain places in the tunnel, it was dangerous for footmen to meet the motor; but that a person could go through with safety, either by waiting on the Dry Branch side, until the motor started into the tunnel with loaded cars, or by learning from the trap door boy, how long the motor had been gone, so as to determine whether there was sufficient time for the person to travel the six hundred feet to the point where the motor track turned off to the tipple; that, if the miner or other person, found himself in the tunnel where there was not sufficient room for the motor to pass, he could have the motor stop by a signal with the hand to the motorman; and that the miners, in passing through the tunnel, always carried their mine lamps with them on their caps.

It is further proved that the deceased worked for, and with, his father in the mines, in the rear mountain beyond Dry Branch, six days before he was killed; that in going to and from his work, he passed with his father through the tunnel each morning and evening; that about three o'clock in the afternoon of the day on which he was killed, he quit work, and started out of the mines to go to the place where he and his father stayed, his father, at the time, telling him to be careful; that after leaving the mines, and crossing the trestle, he went in at the trap door, and started along the entry through the front mountain, over the motor track; that he was struck by the motor and killed about three hundred feet from the trap door, and

about half way between the trap door and the point where the motor track turns to the left into the other entry, going to the tipple; that if the boy had not been struck, the motor would have reached the trap door, and passed through it, in about one and one-half minutes thereafter. It would seem, therefore, that the boy passed through the trap door into the tunnel within a few minutes before the time when the motor was due.

It is also proved that the motor was about three and one-half feet in heigth; that, ordinarily, it carried a headlight, which had, before that time, been broken; that the company had procured another, which did not burn well, and for that reason, it had been taken off by the motorman; and the company had sent for another; that the headlight, when on the motor, did not light the track more than thirty feet in front; that, at the time of the killing of the boy, the motor was not carrying a headlight for the reason stated, but the motorman, who, in his seat on the motor, could see over the top of it, carried a large torch light on his head, which could be seen a distance of two hundred yards; that the motor did not carry a bell or other instrument for alarm; but by the singing of the trolley wire, the motor could be heard coming for a distance of one thousand feet; that the wheels of the motor, and of the cars, and the noise caused by the bumping of the cars against each other, could be heard a distance of from four hundred to five hundred feet; that no miner's light was seen ahead of the motor by the persons in charge thereof to indicate that any one was passing along the tunnel; that the motor was going on a down grade at a speed of from ten to twelve miles per hour with a train of ten empty coal cars attached thereto and could not have been stopped under one hundred feet; that the boy was not seen on the track, and was not discovered until after he was killed. No person testifies how or in what position he was when struck. The motor was thrown from the track; and the boy, when found was under it. It is further shown that the tunnel, at the time, was not lighted by lamps or otherwise; and that there were two electric wires running through the same. It is proved by the father of the boy that he and the boy were doing a "double turn," (the work of two miners); that in the afternoon of the day of his death, about three o'clock, the boy said to his father that he would go out of the mines to provide something for them

to eat, and that the father said, all right, be careful; that the boy was fifteen years and six months old, obedient and industrious; and that father and son were doing about as much as the work of two men. The father also testified that the boy was not stupid; that "he was about as understanding a boy as I had ever seen or had. I have got two more, and he was about the most intelligent boy I ever had." The uncle of the deceased also swore that the boy was considered bright, and fully up to the average. It is also shown that had the boy waited outside of the trap door until the motor returned, made up its load, and started back to the tipple, and had then followed it, he could have passed through the tunnel with perfect safety.

The sole question in the case, as presented by the record, is whether the defendant is guilty of negligence as alleged. Its plea is not guilty. The evidence proves that Eugene Williams was killed on defendant's premises, used by it as a part of its works, for the mining and removal of its coal; that when killed, he had left the mines where he had been that day engaged with his father in digging coal, and was then passing through the tunnel on his way to his lodging place, having finished his day's work for the company; that he was working for his father, and under his care and direction; was performing a miner's work; and that he was intelligent and fully up to the average in mental capacity. There is no suggestion that he was not in the full possession and enjoyment of all of his senses. He had worked six days in the mines with his father, going and returning through the tunnel each morning and evening, to and from his work. Deceased was not obliged to pass through the tunnel to reach his work or to return therefrom. He used the tunnel for his own convenience. He was in no way connected with the work of hauling the coal from the trestle to the tipple. His presence in the tunnel at the time of his death was voluntary on his part. He was under no obligation or duty to the company to be there. No officer or employee of the company had invited or requested him to go there. Neither does it appear that the company ever objected to deceased or any other person going through the tunnel; although it must have known that its employees were making such use of the tunnel.

It is stated by the father that, on one occasion, he saw the motor in the tunnel. It could have been seen, and no doubt

was observed by the deceased, that the tunnel was not lighted, and that the motor carried neither headlight nor bell. If not so observed in the tunnel, ample opportunity was afforded to see this, while the motor remained each trip on the trestle, where it made up its trains. The deceased could have learned, approximately, the location of the motor, when he entered the tunnel through the trap door, had he made inquiry of the boy, who was in charge of the trap door or entrance. It is shown that, at the time of the death of the boy, he was unseen, and his presence unknown by the motorman. No claim is made that either father or son was ignorant as to the character of the tunnel, the existence of the trolley track, the trolley wires, the motor, or the method of operating the same. Neither is it claimed that the death of young Williams was the result of wanton, willful or gross negligence of the company, or its employees. The caution of the father to his son indicates that he knew of and appreciated the danger. What, then, were the legal responsibilities and liabilities, if any, of the defendant to the deceased, under the circumstances of this case? As a matter of course, there can be no negligence when there is no breach of duty. It must appear, therefore, not only that the defendant owed a duty, but also that he did not perform it. Sher. & Redf. Neg. Vol. I, s. 15. Negligence is the doing of something which, under the circumstances, a reasonable person would not do, or the omission to do something in the discharge of a legal duty, which under the circumstances a reasonable person would do, and which act of commission or omission as a natural consequence directly following, produces damages to another. *Washington* v. *B. & O. R. R. Co.*, 17 W. Va. 190.

There would seem to be some question as to whether the deceased was, in the strict sense, in the service of the defendant company, after he had quit his work in the mine for the day, and had started on his journey to his lodging place, beyond the front mountain. It is certain that he was not then engaged in any part of the work for which he was employed by the company, while he was in the tunnel where he was killed; but it may be said that he was yet in the service of the defendant as a coal miner or digger, not having severed his relation with the company. In the case of *McQuick* v. *Shattuck*, 160 Mass. 47, in which plaintiff sued the defendant for injuries received by her

on her way from her home to her work, she being in the employ
of defendants as a laundress, and at the time was riding in de-
fendant's wagon, the court there said: "The plaintiff must be
regarded as having been in the service of the defendants at the
time of the accident. Whether the transportation of the plain-
tiff was actually gratuitous, as it seems to have been, or whether
it was in pursuance of such an understanding between the
parties that it may be deemed to have been a part of the con-
tract, in either case, it was incident to the service which the
plaintiff was to perform and closely connected with it." How-
ever this may be, in the view taken by us of the case, that ques-
tion is not very material.

As hereinbefore stated, the passage of the boy through the
tunnel was not a part of his labor for defendant; nor neces-
sarily connected therewith, as he had other means of reaching
the mine. Not being directed by his employer to go there, his
use of that route was of his own choice, and for his own con-
venience.

If, however, it can be said that, at the time of his death, the
boy was engaged in the work of his employer, it would not under
the facts and circumstances, materially change the result of the
case. A minor, like an adult, assumes the obvious risks of in-
jury from the condition of the business in which he engages;
and those are obvious risks which a person of the plaintiff's ap-
parent age, intelligence, and capacity would discover and ap-
preciate by the exercise of ordinary care. Dresser on Em-
ployer's Liability, s. 96. As to the knowledge which a minor in
fact possesses, and as to the presumption that he will use reason-
able care to inform himself, he stands in no better condition
than an adult. *Idem.* See cases there cited.

Ray on Neg. of Imp. Duties, 18, says that where the owner or
occupier of land, in the prosecution of his own purposes, or busi-
ness, or of a purpose or business in which there is a common
interest, invites another, either expressly or impliedly, to come
upon the premises, he cannot with impunity expose him to un-
reasonable or *concealed dangers,* as, for example, from an open
trap in a passageway. The duty in this case is founded upon
the plainest principles of justice. The keeper of a public place·
of business is bound to keep his premises, and the passageways
to and from them, in a safe condition, and use ordinary care to

avoid accidents or injury to those properly entering upon his premises on business. But this rule only applies to such parts of the building as are a part of, or used to gain access to, or constitute a passage way to and from, the business portion of the building, and not to such parts of the building as are used for the private purposes of the owner, unless the party injured has been induced by invitation or allurement of the owner, express or implied, to enter therein.

In *Sweeney* v. *Old Colony & Newport Ry. Co.*, 10 Allen (Mass.) .368, 372, it is said: "In order to maintain an action for an injury to person or property by reason of negligence or want of due care, there must be shown to exist some obligation or duty towards the plaintiff, which the defendant has left undischarged or unfulfilled. This is the basis on which the cause of action rests. There can be no fault, or negligence, or breach of duty, where there is no act, or service, or contract, which a party is bound to perform or fulfill. All the cases in the books, in which a party is sought to be charged on the ground that he has caused a way or other place to be incumbered or suffered it to be in a dangerous condition, whereby accident and injury have been occasioned to another, turn on the principles that negligence consists in doing or omitting to do an act by which a legal duty or obligation has been violated. Thus a trespasser who comes on the land of another without right cannot maintain an action, if he runs against a barrier or falls into an excavation there situated. The owner of the land is not bound to protect or provide safeguards for wrongdoers. So a licensee, who enters on premises by permission only, without any enticement, allurement or inducement being held -out to him by the owner or occupant, cannot recover damages for injuries caused by obstructions or pitfalls. He goes there at his own risk, and enjoys the license subject to its concomitant perils. No duty is imposed by law on the owner or occupant to keep his premises in a suitable condition for those who come there solely for their own convenience or pleasure, and who are not either expressly invited to enter or induced to come upon them by the purpose for which the premises are appropriated and occupied, or by some preparation or adoption of the place for use by customers or passengers, which might naturally and reasonably lead them to suppose that they might properly and safely enter thereon."

The duty of keeping premises in a safe condition even as against a mere licensee may prove determinate of liability, where affirmative negligence in the management of the property or business of the owner would be likely to subject persons exercising the privilege theretofore permitted and enjoyed to great danger. * * * But to charge a defendant with negligence, on the ground that he has caused a place to be, or remain in, an unsafe and dangerous condition, whereby accident and injury have resulted to another, he must have done or omitted to do an act by which a legal duty or imposed obligation has been violated. Ray Neg., *supra,* 20, 21; *Beck* v. *Carter,* 68 N. Y. 283; *Bary* v. *N. Y. C. & H. R. R. Co.,* 92 N. Y. 290; *Trash* v. *Shotwell,* 41 Minn. 66; *Pierce* v. *Whitcomb,* 48 Vt. 127.

Where there is no nuisance, but a person comes upon the land without invitation, and simply as a bare licensee, and the occupier or owner of the property passively acquiesces in this, if an injury is sustained by reason of a mere defect in the premises, the occupier is not liable, for he has not been guilty of any neglect of duty imposed upon him as such licensor, as the licensee has taken all the risk upon him except as against the affirmative neglect of the occupier of the premises. * * * A mere passive acquiescence on the part of the owner or occupant in the use of real property by others does not involve him in any liability to them for its unfitness for use. 10 Allen, *supra,* 368, 385; *Gillis* v. *Penn R. R. Co.,* 59 Pa. 129. A mere naked license or permission to enter or pass over an estate will not create a duty, nor impose an obligation on the part of the owner or person in possession to provide against the danger of accident. 10 Allen, *supra,* 373; *Crogan* v. *Schiele,* 53 Conn. 186. Where a person has license to go upon the grounds or the inclosure of another, he takes the premises as he finds them, and accepts whatever peril he incurs in the use of such license. Ray, *supra,* 25; *Ind. B. & W. R. Co.* v. *Barnhart,* 115 Ind. 399. The extent of the liability of the occupier of the land to the person whom he has licensed to come upon that land depends on whether the licensee comes on the land for a purpose in which he and the licensor have a joint interest, or from which the licensor derives a profit, and upon his invitation, express or implied, or whether he comes for his own purposes only, in which last case, he is called a licensee. * * * And where the person

coming on the land does so for his own purposes, he is a bare licensee, and he must take the premises in the condition in which they are. Addison on Torts, Vol. I, 320, 322; Cooley on Torts 358. It must be remembered that the deceased went into the tunnel for his own purpose and convenience, without invitation from defendant. The company had no interest whatever in the route selected, or mode of travel, adopted by the decedent, in going to, and returning from, his work in the mines. The company derived no profit whatever from the travel of the boy through the tunnel.

Plaintiff in error cites many decisions to convince us that the trial court erred in refusing to submit the evidence to the jury. The rule in such case is so well established in this State, that it is not open to further controversy. In *Butcher* v. *W. Va. & P. R'd Co.,* 37 W. Va. 180, it is held: "Where negligence is the ground of the action it rests upon the plaintiff to trace the fault for his injury to the defendant, and for this purpose he must show the circumstances under which the injury occurred, and if, from these circumstances so proven by the plaintiff, it appears that the fault was mutual, or, in other words, that contributory negligence is fairly imputable to him, he has, by proving the circumstances, disproved his right to recover, and on the plaintiff's evidence alone the jury should find for the defendant." *Gerity's Adm'r* v. *Haley,* 29 W. Va. 98.

In *Ketterman* v. *Dry Fork Railroad Co.,* 48 W. Va. 606, it is held: "Though questions of negligence and contributory negligence are, ordinarily, questions of fact to be passed upon by the jury, yet, when the undisputed evidence is so conclusive that the court would be compelled to set aside a verdict in opposition to it, it may withdraw the case from the consideration of the jury, and direct a verdict. When, in actions for negligence, the facts are undisputed, and such that all reasonable minds must draw the same conclusion from them, it is the duty of the judge to say, if asked, as a matter of law, whether or not they make a case actionable negligence. In such cases, however, when the facts are in dispute, it is the duty of the judge to submit them to the jury. In actions for negligence, the courts have abrogated the doctrine that a mere scintilla of evidence from which there might be a surmise of negligence is sufficient to carry a case to the jury, and have adopted the more reasonable rule that

there is a preliminary question which the judge must decide, if asked, whether, granting to the testimony all the probative force to which it is entitled, a jury can properly and justifiably infer negligence from the facts proved; for, while negligence is usually an inference from facts it must be proved, and competent and sufficient evidence is as much required to prove it as to prove any other fact."

We therefore conclude, as a matter of law, that the facts proved do not make out a case of actionable negligence against the defendant.

But plaintiff in error further complains that the court also erred in refusing to permit the plaintiff to prove the declarations of the motorman and brakeman as to the cause of the injury, made within a few minutes after the accident occurred.

Augustus Williams, the father of the boy, was asked by plaintiff's counsel, "Did you have any conversation, when you were there to see about your dead boy, with the motorman, or any one connected with the running of that train, and if so, tell the jury what it was?" This question was objected to by the defendant, and was not answered. But at the close of the evidence of this witness, "plaintiff offered to prove by the witness, the declarations of the motorman and brakeman as to the cause of the accident, within a few minutes after the accident occurred, to which the defendant objected, which objection being sustained, the plaintiff excepted." It does not appear what specific declarations the plaintiff could have proved, or expected to prove by the witness.

In *Sesler* v. *Coal Co.,* 51 W. Va. 318, it is held: "When a question is put to a witness and the court refuses to allow it to be answered, if the question does not plainly itself import that the answer will prove a fact material, it must appear by a bill of exceptions what was proposed and expected to be proven, else there is no error apparent. If a question objected to is answered, the answer must be shown, else there is no error apparent." *Jackson* v. *Haught,* 38 W. Va. 236; *Union Central Co.* v. *Polard,* 94 Va. 146.

If the exception, for allowing or refusing to allow a question to be answered by a witness, fails to give the answer of the witness, or what is expected to be proved by him, the appellate court cannot determine the relevancy, admissibility or value of

the answer, and the exception will not be considered. *Kay* v. *Glade Creek Ry. Co.,* 47 W. Va. 467, 478.

Williams, after stating what occurred when his boy left him in the mines, says: "And then in about twenty minutes, or probably longer, twenty-five, or half an hour, I couldn't tell you exactly, the length of time, * * * a boy came in the room (mine) and said: Mr. Williams your boy got run over; and I just dropped everything, and went out, * * * and I had to go from one mountain to the other mountain; * * * and when I got to the place, I seen the motor was off the track; but I didn't know anything about the boy being under there."

If statements or declarations were made to the witness by the motorman and brakeman, or by either of them, as to the cause of the accident, such statements could be admitted as evidence only, because they were parts of the *res gestae.* 2 Jones on Ev. s. 348, says: "Whether a statement or act is or is not a part of the *res gestae* depends wholly upon the facts of each case; and it is therefore difficult, if not impossible, to frame any satisfactory definition of the term *res gestae.* But there are certain well recognized tests or rules which may be applied in determining whether a given statement or act is to be rejected as hearsay, or admitted as part of the *res gestae.* One *of* these is that declarations are not admissible if they amount to no more than *a mere narrative of a past occurrence.* Thus, when the holder of a check went into a bank and when he came out said he had demanded payment, the declaration was held inadmissible. So where one was fatally injured by a railway train made statements half an hour after the occurrence, the statements were held no part of the *res gestae;* and in an action against a township for injuries caused by a defective bridge, statements made by the plaintiff as to the cause and circumstances of the injury were held inadmissible. The rule has often been declared that the declarations must be *contemporaneous* with the facts which they illustrate; and many cases might be cited as examples of such rulings. Thus, in a case which has excited much discussion and which has been regarded as an extreme case, it was held that a statement made by a person immediately after the act, while running out of the room in which her throat had been cut, was incompetent and in many other cases it has been held that declarations, immediately or a

few minutes after the event sought to be explained, could not be received. In these and many similar cases which might be cited the declarations were not so clearly *contemporaneous* with the transaction in issue as to characterize or explain it. They were mere narratives of transactions wholly completed. These declarations depended for their truth wholly upon the accuracy and reliability of the declarant and the witness, and were not corroborated by any event or fact, then transpiring, by means of which their truth could be tested."

Wharton's Crim. Ev. s. 262, says: "*Res gestae* are events speaking for themselves through instinctive words and acts of participants—not the words and acts of participants, when narrating the events. What is done or said by participants *under immediate* spur of a transaction, becomes thus part of the transaction, because it is then the transaction that speaks." To be part of the *res gestae,* the declaration must have been made at the time of the act done, so that the act and the declaration obviously constitute but one transaction. *Western Boatman's Ass'n* v. *Kribben,* 48 Mo. 37; 1 Green Ev. 138; 1 Phill. Ev. 150, 436; Story Ag. 150, 152. Therefore, any declarations of the motorman or brakeman which might have been given by the witness in response to said question, would have been improper, because clearly not constituting a part of the *res gestae.* The court did not err in sustaining the objection, and refusing to allow the witness to answer.

We find no error in the judgment of the circuit court. It must be affirmed.

*Affirmed.*

Note by POFFENBARGER, PRESIDENT, *(concurring)*:

The opinion prepared by JUDGE MILLER proceeds upon the theory that the boy was either a trespasser or a mere licensee, to whom the defendant company owed no duty other than that of refraining from willful injury to him. In that view I do not concur. It does not appear that there was a contract between the company and the boy, but the evidence tends to show that the contractual relation between the father and the company extended to the boy, whose service was to be rendered to the company on behalf of the father. If this did not make him an

employee of the company, his relation corresponded to that of a servant of an independent contractor, to whom the owner of the premises owes the duty of providing safe premises, but not safe appliances unless he is bound by the contract to furnish them. As the boy was permitted to work in the mine under the father's contract of employment, he was clearly not a trespasser nor a mere licensee: He was there by the invitation of the company. It owed him at least as high a duty as is due from a proprietor to the servants of an independent contractor. "In most every such case there is the further implication that if the contractor brings third persons, his own employees, his partners or assistants, to assist him in executing the contract, such persons are presumably upon the premises by the invitation of the owners, and he owes to them the same measure of care, to the end of promoting their safety, that he owes to the contractor himself,— and this, although no contractual relation exists between the proprietor and them. Therefore, where the owner of a building caused a stage to be erected for use by one who had contracted with him to supply the building with fire extinguishing apparatus, and the staging was constructed in a negligent manner, in consequence of which an employee of the contractor was killed, the owner was liable for the death of the employee, although no contractual relation existed between them." I Thomp. Com. Neg. s. 979.

The tunnel in which the boy was killed, whether part of the mine or not, was so connected with the employment as to impose upon the company a duty to its employees in respect thereto. It was the only convenient way provided for going to and returning from the work. It was used for that purpose, whether built for it or not. It does not appear that any of the miners used the path over the hill, and it does appear that the miners generally went to and from work through the tunnel. It was the usual and ordinary way of ingress and egress. "It is one of the fundamental duties incumbent upon the mine owner to furnish suitable and safe means of ingress and egress for those whom he has employed to labor in his mine." White on Mines and Mining Remedies, s. 395. A manufacturing company is liable to an employee for injuries sustained by reason of a defective stairway or approach to the building in which he works. *Fitzgerald v. Paper Co.,* 155 Mass. 155. In that case, Knowlton, Judge,

speaking of the defendant corporation, said: "It was its duty to provide on its premises a reasonably safe passage way for the use of its employees in going to and from their work." Persons who go upon the premises of another as invited guests, or upon business with, or to· perform a service for, him, as in the cases of patrons of a store or custom mill, passengers of a railroad company, and laborers and servants of an independent contractor, may hold the owner to the duty of such reasonable care; but persons who go upon the premises of another for their own pleasure, without invitation, or upon business of their own, in which the owner is not concerned or has no interest whatever, are mere licensees, · if the owner knows of, and acquiesces in, such use. Otherwise they are trespassers.

I concur in the decision, however. The facts bring the case within the doctrine, *Volenti non fit injuria.* The deceased knew the dangerous character of the place. He was of sufficient age and intelligence to comprehend the danger, for it was so apparent as to leave no room for doubt. He assumed not only the risk·incident to the employment, but also the risk attendant upon the particular journey through that dark tunnel in which he knew the motor ran. The doctrine applies to minors as well as adults, if it be shown that he knew the danger. "This principle has been applied in favor of the master in cases where the injury was caused by the negligence of a fellow servant; by permanent, visible conditions of the ·plant; by the common operations incident to the performance of his duties; by a defect in an appliance, where the existence of that defect does not imply negligence on the master's part." Labait on Master and Servant, s. 291. This author says the rule above stated differs from the corresponding rule applicable to an adult in one important respect, but does not state·any other, although he discusses the question at considerable length, referring to many authorities. The point of difference is thus stated: "In the case of an adult the servant's liability to recover for injuries resulting from ordinary risks is declared in terms which are indicative of the fact that his comprehension of those risks is presumed in the absence of evidence which justifies the opposite conclusion. In the case of a minor, on the other hand, the defense of an assumption of ordinary risks is viewed as one which is merely conditional upon the production of specific and positive evidence

going to show that the risk in question was, as a matter of fact, comprehended. In short, where a minor is concerned, ordinary risks are, for evidential purposes, always treated at the outset of the inquiry as extraordinary, and the burden of establishing the servant's comprehension of the particular risk is cast upon the employer."

The plaintiff shows by his own case that the deceased had for six days been passing through this dark tunnel and that he was a boy of more than ordinary intelligence. He must have known that it was dark and dangerous, and, on leaving his father, he was instructed to be careful. In the absence of proof by the plaintiff of the facts precluding recovery, the defendant would be compelled to show them, if it would defeat recovery, but they appear here as a part of the plaintiff's own case.

Judges DENT and McWHORTER concur in the views herein expressed.