**Donzel LEMLEY, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**Civ. A. No. 67–22–F.**

United States District Court, N. D. West Virginia, Fairmont Division.

Aug. 7, 1970.

Michael Tomasky, Mike Magro, Jr., Morgantown, W. Va., for plaintiff.

Paul C. Camilletti, U. S. Atty., Thomas M. McCulloch, Asst. U. S. Atty., Wheeling, W. Va., Leslie D. Lucas, Asst. U. S. Atty., Elkins, W. Va., Eugene N. Hamilton, Dept. of Justice, Washington, D. C., for defendant.

## STATEMENT OF THE CASE

CHRISTIE, District Judge:

The plaintiff, Donzel Lemley, sues the defendant, United States of America, for damages for personal injuries he sustained on May 20, 1966, in a fall from a scaffold at the site of the construction of the Forestry Sciences Laboratory building for the United States Department of Agriculture, at Morgantown, West Virginia. The action is brought under the Federal Tort Claims Act, 28 U.S.C.A. § 2671, et seq., which makes the United States liable for tort claims to the same extent as a private individual under like circumstances, with certain exceptions not applicable here.

The contract for the construction of the Forestry Sciences Laboratory building, designated No. 03B–14604, was awarded by General Services Administration to Baker & Coombs, Inc., a contracting firm of Morgantown, on November 16, 1965. The contract required Baker & Coombs to furnish all labor and material and perform all work in the construction of the building. Plaintiff Lemley was employed by Baker & Coombs as a cement finisher and was acting in the course of his employment on the job when the accident occurred and he sustained the injuries that are the subject of this action.

The contract incorporated by reference a government publication, identified as GSA Handbook—PBS–5900.3, dated February 16, 1962, entitled "Accident and Fire Prevention—Construction Alteration Work," and it provided that in the performance of the contract the contractor should comply with the applicable provisions of the handbook and should take any other precautions necessary to protect all persons against injury at the site of the work. Chapter 8 sets forth the handbook's requirements with reference to construction and maintenance of scaffolding. It is conceded by the Government that the scaffold from which the plaintiff fell was not at the time in compliance with the handbook requirements.

Chapter 1 of the handbook sets forth that its purpose is to establish uniform accident prevention and fire safety standards, criteria, procedures, and work practices for the protection of federal and contractor personnel, the public, and property during the construction and alteration activities. It makes the general contractor responsible for complying with the requirements set forth in the handbook, and Section 3(b) thereof places upon the government enforcement responsibility as follows:

"(b). The Government representative shall be responsible for ascertaining that contractors adhere to the requirements set forth in this handbook. If the Government representative notifies the contractor of any noncompliance with the provisions of this handbook and the action to be taken, the contractor shall (immediately, if so directed, or in not more than 48 hours after receipt of such notice) correct the existent conditions. If the contractor fails to comply promptly, all or any part of the work being performed may be stopped by the contracting officer. When, in the opinion of the contracting officer, satisfactory corrective action is taken by the contractor a start order will be given immediately. * * *."

Negligence is charged against the contractor for failing to construct and maintain the scaffold in compliance with the handbook and for not furnishing the plaintiff with a reasonably safe place to work, and negligence is charged against the defendant Government for failure to properly inspect and supervise the work and for not requiring the contractor to comply with the safety requirements of the handbook. In defense, the Government asserts that the accident and plaintiff's resultant injuries were caused (a) solely or contributed to by his own carelessness and negligent conduct, or (b) solely by the acts or omissions of the contractor, its agents or employees, and (c) because the plaintiff knowingly and voluntarily assumed the risk of injury in performing

his undertaking. These issues were tried to the Court without a jury on August 11 and 12, 1969, (the issue of damages was deferred) and the Court now states its Findings of Fact and Conclusions of Law, as required by Rule 52 of the Federal Rules of Civil Procedure.

### FINDINGS OF FACT

1. During the course of the performance of the construction contract, a Government employee, Walter L. Hull, whose official title was construction engineer, was assigned to the premises as a construction inspector.

2. Mr. Hull at all times during the performance of his duties as a construction engineer was fully qualified to inspect the construction and work of the contract, for Mr. Hull at that time had been working with the General Services Administration in the capacity of a construction inspector since the early part of 1961. Prior to the time Mr. Hull began his employment with the General Services Administration in the early part of 1961, he had been employed as an inspector and construction engineer with the United States Army Corps of Engineers for the period of about fifteen years. Prior to the time he went to work for the United States Army Corps of Engineers he had worked for the State Roads Commission of the State of Maryland and discharged duties with respect to and related to the construction of highways and roads. In addition, he had served as the county road engineer for two years for Garrett County, Maryland.

3. It was Mr. Hull's duty and responsibility during the course of the performance of the work of the contract by the contractor to inspect the contractor's work to make certain that the work conformed with the plans and specifications of the contract. This was the same type of work that he had been performing for the General Services Administration since the early part of 1961.

4. It was Mr. Hull's duty and responsibility to inspect and observe the contractor's work with respect to the quality of workmanship, the materials used and incorporated in the work, and to determine whether the contractor was in compliance with GSA Handbook—PBS–5900.3.

5. Prior to the time that the actual work of the contract commenced, a preconstruction conference was held between representatives of the Government and representatives of the contractor. During the course of this preconstruction conference, a copy of the handbook was given by the Government representatives to the representatives of the contractor.

6. During the course of the performance of the work of the said contract, although Mr. Hull was assigned to at least two other General Services Administration construction projects, at least 90% of his time was spent on the premises of the Forestry Sciences Laboratory building.

7. On the date of the accident, Mr. Hull made it a point to be on the premises prior to the time that the contractor started his work on that date and it is estimated that Mr. Hull arrived at the site of the work about 9:00 a.m.

8. On the day of the accident, the contractor was in the process of pouring the second floor concrete slab. The concrete that was being used to pour the slab was unloaded from concrete trucks at ground level into a hopper which was a part of a conveyor. The concrete was fed out from the hopper of the conveyor onto the belt and by that means transported up to the level of the second floor. When the concrete reached the end of the conveyor belt which was projected over the outside wall of the building, it would drop off the end of the conveyor belt and then would be spread out by the contractor's workers on the second floor.

9. The conveyor belt by which the concrete was transported from the ground level up to the second floor was equipped with its own motor, but the conveyor had no power for locomotion, and it had to be moved from place to place through the use of a truck or Pet-

tibone fork lift. During the course of the work of the day of the accident, it was necessary to position the conveyor along the side of the building at several different points.

10. The plaintiff had been working for some time throughout the day of his injury and was working just prior to the time of his injury as a cement finisher during the pouring of the second floor. During the course of the performance of this work, there was at least one other cement finisher working with him. In addition, there were several other of the contractor's employees working on the ground for the purpose of delivering the concrete from the trucks into the hopper of the conveyor to then be transported to the second floor. Mr. Bud Strosnider, the contractor's superintendent, was working on the second floor, as were several laborers who were not finishing the concrete but were simply spreading it out so that it could be finished by the plaintiff and the other cement finisher.

11. The building, and in particular the second floor thereof, had an over-all length as shown by the contract drawings of 155′ 8″ and the width thereof was 34′ 8″.

12. A temporary bulkhead had been built across the entire width of the second floor from side to side at approximately midway of the length of the building. The purpose of this bulkhead was to permit the pouring of about one-half of the second floor on the day of the accident.

13. On the date of the accident, Mr. Hull spent almost all of his time on the second floor where the concrete was being poured and finished. He so positioned himself that he could observe the work in progress so as to determine whether the materials being used and the workmanship were in conformity with the requirements of the plans and specifications of the contract.

14. During the course of pouring the second floor, it was a part of Mr. Hull's duties to observe the amount of slump or wetness in the concrete being used by the contractor. He made sufficient observations to determine that the concrete being used by the contractor was of the specified slump or wetness and that the concrete otherwise met the requirements of the contract's specifications.

15. The plaintiff in this action was injured at about 3:00 p.m., on the afternoon of May 20, 1966, when he fell while attempting to walk on a wooden plank two inches thick, 12 inches wide and about 8 to 10 feet long. This plank had been used as a part of the foundation for the plywood flooring of the scaffold which had been erected around the outside of the building by the contractor to be used as a work platform by the bricklayers.

16. The plank from which the plaintiff fell was about 10 feet above the ground, and it was upon the scaffold that the contractor had erected for the bricklayers. The scaffold was a lattice work of vertical and horizontal tubular bars. It had horizontal tubular steel braces spaced about 8 feet apart. Initially two planks, each being 2 inches thick, 12 inches wide and 8 to 10 feet long were placed over each two adjacent horizontal supporting braces, so that each plank overlapped by about 1 foot each of two adjacent horizontal braces. The horizontal braces were about 4 feet long and one of the planks which overlapped each horizontal brace was laid at either end of the horizontal brace. This formed two continuous lines of planking throughout the scaffold, one toward the front of the scaffold and one toward the rear. In addition, each plank not only overlapped a horizontal brace, but it also overlapped or was overlapped by the adjacent plank. These overlapping planks were "toenailed" to one another. Then to form the floor for the scaffolding, plywood sheets 4′ x 8′ were laid on top of the planks continuously throughout the scaffolding. This plywood was then nailed to the planks. The scaffolding as thus constructed stretched the length of the building.

17. The plaintiff fell from a section of the scaffold from which the plywood flooring had been removed by one or

more employees of the contractor. Also, the plank from which the plaintiff fell had been dislodged when the plywood was removed, so that when he attempted to use that plank it was at one end no longer toenailed to, in line with, or fully supported by, the next adjacent plank, nor was the same end of that plank overlapping or supported by a horizontal brace. The plaintiff fell when this plank on which he was standing or walking simply tilted side down.

18. In that area of the scaffold from which the plaintiff fell, the scaffold was in violation of Chapter 8, paragraph 2(h) of the safety handbook which provided as follows:

"(h) Planking used as working surfaces on runways, platforms, ramps, or scaffolds, in addition to complying with the standards established herein shall be uniform in thickness, and be laid not more than three-eighths inch apart. They shall be supported or braced to prevent excessive spring or deflection and secured and supported sufficiently to prevent loosening, tipping, or displacement. See Figure 8–2.3 also."

19. At the time of the plaintiff's fall, Mr. Hull was on the ground talking with Mr. Tom Coombs, who was the contractor's foreman.

20. On the day of the accident, the scaffolding was not being used by the contractor as a part of his plant or tools for performing the work in which he was then engaged. It had been last used the day before by the bricklayers. Mr. Hull had not seen or observed, before plaintiff attempted to use that section of the scaffold from which he fell, that the plywood had been removed from that section or that the planking of that section had been dislodged from its initial position. The plywood had been removed from the scaffold only a very short time before the accident, for an unknown reason and by an unknown person, and Mr. Hull had not inspected the scaffolding on the day the plaintiff fell because there was no activity that day which would reasonably indicate that the

scaffolding would be used by someone. The plywood was in position the day before the accident when the scaffolding was being used by the bricklayers.

21. At the time of the plaintiff's accident, bricklaying—the primary purpose for which the scaffolding had been constructed—had progressed 4 to 5 feet above the floor of the scaffold so that the further usefulness of the scaffold to the contractor depended upon the floor of the scaffold being torn down, another section of the tubular steel bars being added and the floor of the scaffold being replaced at a height of about 6 feet above the previous level. This tearing down of the scaffolding floor had not started at the time the plaintiff fell. In order to observe from the work area on the day of the plaintiff's injury that the plywood had been removed from the scaffold, it would have been necessary to look over the top of the wall of the building which, on that date, was about 4 to 5 feet above the work area. Mr. Hull was standing in this work area most of the time on May 20, 1966, before plaintiff's injury.

22. On May 20, 1966, the construction of the building had not progressed to the point where the permanent stairway between the first floor and the second floor had been installed. There was in place, however, between the first floor and the second floor a wooden ladder which extended from the first floor up through a duct space to the second floor. This ladder was the normal and routine route over and by which workers traveled from the first floor up to the second floor (and vice versa), where the work on the day in question was being performed.

23. Mr. Tom Coombs, who was labor foreman for the contractor was present on the premises on which the building was being constructed all day on the date of plaintiff's accident. He had worked on the ground all that day and had been working, just before plaintiff fell, only a short distance from the area of the scaffold from which the plywood had been removed. Indeed, Mr. Coombs

had thrown the plaintiff a water hose only seconds before he fell, and at that time the plaintiff was standing on the scaffold and the absence of the plywood was in Mr. Coombs' unobstructed plain view.

24. Mr. Coombs described the manner in which the plaintiff fell as follows, at p. 120 of the transcript and it is in substantial accord with the plaintiff's version:

"A. I saw him take a step on one of the supporting planks; by supporting I mean that they supported normally a piece of plywood. He stepped on one of these planks, and apparently he had set his foot a little too close to the edge which caused the plank to flip, throwing him off balance."

25. Mr. Coombs, the second highest ranking employee of the contractor at the site of the performance of the work of the contract, received no orders or instructions from Mr. Hull, but instead, orders regarding the manner of performing the work of the contract were given by Mr. Strosnider, the contractor's superintendent.

26. On the day of the accident, Mr. Coombs was in charge of and operating the conveyor on the ground through which the concrete was transported from the ground to the second floor of the building. This conveyor was positioned very close to the scaffold from which the plaintiff fell, sometimes as close as 6 inches to a foot. The missing plywood was in plain view of Mr. Coombs and he conceded after the fall that in that condition the scaffold was unsafe for one to walk on it. He further conceded that no signs warning of the unsafe condition of the scaffold were erected prior to plaintiff's fall.

27. It was possible during the course of the day on which plaintiff fell that the conveyor might have come in contact with the scaffolding. Mr. Herndon, one of the contractor's carpenters, was working on the first floor of the building in close proximity to the conveyor and he testified that he saw and observed the conveyor contact and strike the scaffolding from which plaintiff fell before the time of his fall. Mr. Herndon also testified that in coming in contact with the scaffolding, the scaffolding was pulled about 18 inches away from the brick wall. He had no recollection as to the extent of damage, if any, sustained by the scaffolding as a result of the conveyor coming in contact therewith. Plaintiff fell from the area of the scaffolding which previously had been struck by the conveyor. The length of time that elapsed between the time that the conveyor struck the scaffolding and the time of plaintiff's fall was from a half hour to two hours.

28. Mr. Herndon took orders and instructions regarding the manner of performing his work on the premises of the building from his boss and he hardly knew Mr. Hull, the Government representative who was on the premises during the time the work was being performed.

29. Mr. James L. Strosnider, an employee of the contractor, was an experienced carpenter and prior to May 20, 1966, had built and constructed quite a few scaffolds similar to the scaffold from which the plaintiff fell in this action. As a matter of fact, Mr. Strosnider rebuilt the scaffold from which the plaintiff fell after the accident. This was done when it became necessary to extend the height of the scaffold.

30. Just before plaintiff fell, Mr. Strosnider saw and observed the plaintiff standing on the scaffold and at that time he (Strosnider) knew and observed that the plywood flooring had been removed from the section of scaffolding from which plaintiff fell.

31. When Mr. Strosnider saw and observed plaintiff on the scaffolding just before the time he fell therefrom, he knew that the plaintiff had already walked across the section of scaffolding from which the plywood had been removed, and he knew that the plaintiff would have to walk back across that section of scaffolding in order to return to

the place on the second floor at which the plaintiff was working.

32. Although Mr. Strosnider saw and observed that the plywood had been removed from the scaffolding in the area from which the plaintiff fell, and although he knew that the plaintiff would have to walk across that area of scaffolding in order to return to the place where he was working on the second floor, and although he was talking to the plaintiff while he was standing on the scaffolding just before the fall, Mr. Strosnider did not give the plaintiff any warning or caution regarding the absence of the plywood or the danger that its absence might present.

33. Mr. James L. Strosnider also testified that he took no orders or instructions from Mr. Walter Hull, the Government's inspector, but that he took his orders and instructions regarding the manner of proceeding with the work of the contract from his foreman, Mr. Ireland, a supervisor in the employ of the contractor.

34. Mr. Strosnider, an experienced builder of scaffolding, testified that one could not observe the plank from which plaintiff fell very well from the second floor and likewise could not observe very well from that point that the toenailing had been removed therefrom. He further testified that he did not observe that the toenailing had been removed from the planking when he looked at the plank just before the plaintiff stepped thereon and fell. He was able to determine that the toenailing had been removed from the planks only after his examination thereof after the plaintiff fell.

35. At the time of his injury, plaintiff in this action had been employed in the construction industry since 1949. During the period of time that he had been employed in the construction industry, he had worked on numerous jobs and with the exception of a period of about one year, he had been employed in the construction industry by Baker & Coombs, by whom he was also employed on the date of his injury.

36. Plaintiff reported to the Forestry Sciences building at about 9:30 a.m. on the morning of May 20, 1966, and he proceeded a short time thereafter to the second floor of the building where the concrete floor on which he was to work was to be poured. In reaching the second floor, he used a wooden ladder which ran up from the first floor through a hole in the second floor. He also used this ladder when he left the second floor for lunch on May 20, 1966.

37. During the course of performing his work on May 20, 1966, before the time of his injury, it was necessary for plaintiff from time to time to obtain water with which to wet the concrete forms and the concrete with which the second floor was being poured. When it so became necessary for the plaintiff to obtain water, he obtained it from a hose which was on the second floor. He obtained all the water he needed on May 20, 1966, in this manner, except the water that he was in the process of obtaining just prior to the time of his fall.

38. At the time of his fall, plaintiff had left the second floor of the building and had gone down onto the scaffolding which was on the side of the building and proceeded along the scaffolding across the area from which the plywood flooring had been removed therefrom toward Mr. Coombs who was on the ground and who at that time had a water hose he was using to wash out the conveyor that had been used to transport the concrete from the ground to the second floor.

39. The plaintiff proceeded along the scaffolding by balancing himself on one of two planks which initially had been used to support the plywood flooring which had been removed. At the time plaintiff first crossed this area, he noticed and observed that the plywood flooring had been removed and that the outside plank of that area did not overlap at one end of a horizontal tubular steel brace of the scaffolding. Plaintiff also noticed when he first walked across that section of the scaffolding from which the plywood flooring had been re-

moved that this end of the outside plank was only partially supported by an adjacent plank which itself had overlapped a horizontal tubular steel bracing of the scaffolding, and he noticed and observed that this outside plank was dislodged somewhat laterally, so that it did not completely overlap the adjacent plank.

40. At the time of his injury, plaintiff had had previous experience in the construction of the type of scaffolding from which he fell and he knew that it was normal and customary for the supporting planks of scaffolding of this type to overlap the adjacent plank on either end and to overlap on either end a horizontal tubular steel brace of the scaffolding.

41. Plaintiff fell from the scaffolding on May 20, 1966, as a direct proximate result of the absence of plywood flooring from a section of the scaffolding and because the plank on which he was standing just prior to his fall had been dislodged from its initial position of overlapping at either end with the adjacent plank and a horizontal tubular steel brace of the scaffold. Both of these conditions were open and obvious to, and were observed by, the plaintiff before he attempted to cross this dangerous section of the scaffolding for the first time and before he attempted to use that section of the scaffolding for the second time.

42. The scaffold from which plaintiff fell was brought on the premises of the building by the contractor and was its property. This scaffolding was constructed and erected by the contractor through its own employees under the direction of its supervisory personnel. The plywood flooring had been removed from the section of the scaffolding from which plaintiff fell sometime during the late morning or early afternoon of the day the plaintiff fell. The Government inspector had not observed this condition nor had anyone brought it to his attention prior to the accident.

43. The hose which the plaintiff crossed the defective section of scaffolding to use just prior to the time he fell was 200 feet in length, and it was long enough to stretch all the way to either the north end or the south end of the building, and he could have obtained and used it without crossing that part of the scaffolding that had the missing plywood flooring.

44. The contractor's superintendent, Mr. Donley Ralph Strosnider, who was the highest ranking employee of the contractor on the premises, testified that most of his time on May 20, 1966, was spent on the second floor of the building supervising the pouring of the concrete for the second floor. He said also that it became necessary from time to time during the course of the day for him to leave the second floor to attend to other matters and then to return thereto. While he had been on the premises for the complete day and up to the time that plaintiff fell, he had not observed that the plywood flooring had been removed from that section of the scaffold from which plaintiff fell.

45. This witness also testified that he regarded the Government's inspector, Mr. Walter Hull, as the owner of the building and that he was there to make certain that the contractor's work and materials conformed to the plans and specifications.

## CONCLUSIONS OF LAW

### I

■ The plaintiff, at the time of his injury, was at the construction site and upon the premises of the defendant as an employee of the independent contractor. It is clear that the defendant owed the plaintiff the duty of exercising reasonable care that it not injure him, however, this duty did not make the defendant liable for the negligence of such independent contractor or his servants in the performance of the work, nor did it extend to conditions, instrumentalities and procedures which were constantly changing during the course of the work and which were in the exclusive control

of the independent contractor. Chenoweth v. Settle Engineers, 151 W.Va. 830, 156 S.E.2d 297 (1967).

█ It is, of course, the recognized general rule that a contract should be construed most strongly against the drafter, which in this case is the defendant United States of America, Sternberger v. United States, 401 F.2d 1012, 185 Ct.Cl. 528 (1968); Sun Shipbuilding & Drydock Co. v. United States, 393 F.2d 807, 183 Ct.Cl. 358 (1968), and it appears to be conceded by the defendant that the safety handbook requirements, which were a part of the contract by reference, were not being complied with at the time of plaintiff's fall and injury. But, notwithstanding this presumption and violation, the Court is of the opinion that the mere reservation of a right to inspect the work for compliance with the contract terms does not give rise to a sustainable claim under the Federal Tort Claims Act. 28 U.S.C.A. § 1346(b). That statute provides for recovery against the United States in tort thusly:

"* * * (F)or injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, *if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.*" (Emphasis added).

█ The law of West Virginia imposing liability on a private person is contingent upon a legal duty running from that person to the injured party. In other words, where there is no legal duty owed by one person to another in respect to the safety of the person or property of such other, there can be no actionable negligence. 13 M.J. Negligence, Sec. 12; Robbins v. Baltimore & Ohio R. Co., 62 W.Va. 535, 69 S.E. 512 (1907); Williams v. Belmont Coal & Coke Co., 55 W.Va. 84, 46 S.E. 802 (1904); State ex rel. Cox v. Sims, 138 W.Va. 482, 77 S.E.2d 151 (1953).

In Beason v. United States, 396 F.2d 2 (5th Cir. 1968), where there was a contract very similar to the present one and an employee of an independent contractor was injured, it was held that there was no duty imposed upon the United States to maintain safe working conditions for the employee where the only governmental undertaking relied upon was a safety inspection program in connection with work being performed by the independent contractor. The cause of action in the instant case is buttressed on this premise. Other circuits have gone further and held that the Government has the right, but *not the duty,* to inspect the work and the contractor's equipment. Kirk v. United States, 270 F.2d 110 (9th Cir. 1959); Cannon v. United States, 328 F.2d 763 (7th Cir. 1964), cert. den. 379 U.S. 832, 85 S.Ct. 63, 13 L.Ed.2d 40 (1964); Grogan v. United States, 341 F.2d 39 (6th Cir. 1965); Gowdy v. United States, 412 F.2d 525 (6th Cir. 1969). In the latter case, Gowdy was a journeyman electrician employed by Whittaker Electric Company, an independent contractor, which had a contract with the Coast Guard to install new electrical machinery in a machinery house which was part of a lighthouse located on a breakwater on Lake Michigan. While operating a hand hoist or rachet on the flat roof of the machinery house, Gowdy lost his balance and fell eleven feet to the ground, sustaining serious injuries. In his complaint, Gowdy alleged negligence on the part of the Government in the following respects:

1. In hiring an incompetent contractor;

2. In not exercising reasonable care in the performance of its right of control over plaintiff's employer;

3. In furnishing unsafe equipment;

4. In giving ambiguous orders to an independent contractor;

5. In failing to warn plaintiff of the dangerous condition of the lighthouse; and

6. In failing to provide a reasonably safe place to work.

The District Court found only that the Government was negligent in one particular, namely, in failing to install a guardrail around the flat roof of the machinery house so as to prevent plaintiff's fall therefrom. In reversing the District Court, the Court of Appeals said at p. 529:

> "The Government was not required to exercise any supervision or control over its independent contractor and is not liable for failure to do so. The mere reservation of the right to inspect the work did not impose upon the Government any duty of inspection or control."

The Court further pointed out that the Government is not liable for the negligence of the independent contractor, since the Federal Tort Claims Act limits liability to injuries "caused by the negligent or wrongful act or omission of any employee of the Government * * *," citing its earlier case of Grogan v. United States, supra, as authority for the proposition. Also, at p. 534 the Court reiterated that,

> "The mere fact that the Government may have had superior knowledge of safety standards did not increase its duty to exercise ordinary care. The Government was not performing the work, and Gowdy was not under its supervision or control. * * * As before stated, the Government owed no duty of inspection and control of the operations of the independent contractor."

Recently, the Tenth Circuit, in Craghead v. United States, 423 F.2d 664 (1970), had occasion to consider a similar claim arising under Section 1346(b) of the Federal Tort Claims Act. The plaintiff Craghead was injured while employed as a carpenter-welder by an independent contractor doing work for the Government. He was acting in the course of his employment when a scaffold on which he was standing fell. Plaintiff asserted that one of the horizontal bolts protruding from the base of a concrete pourer on which this scaffold or board rested was a "dummy bolt" without threads on it and that this "dummy bolt" was the cause of the accident. The crucial allegation made by plaintiff in that case was that the United States through its Corps of Engineers "had the duty or undertook the duty to maintain and enforce safety standards and to inspect the work places, machinery and equipment used by the employee and to advise, report, counsel and to recommend to the employer the existence of any unsafe, dangerous, hazardous or negligent condition thereabout and that such inspections were planned, periodic and directed to the safety of the employees on the project, * * *." Therefore, the basic claim was that the Government negligently breached its duty to supervise and inspect safety measures and to enforce safety standards. In denying plaintiff's claim the Court reasoned that exclusive control of the worksite remained in the contractor, and with that premise, the mere reservation of a right to inspect and enforce certain safety measures is not indicative of governmental control over the employees of the independent contractor and cannot be the basis for the prosecution of a claim under the Federal Tort Claims Act, and, as we have seen, West Virginia has found this principle to be applicable to private parties as well. Chenoweth v. Settle Engineers, supra.

■ In the instant case, the contract imposed upon the independent contractor the duty to perform all work and supply all materials, tools and appliances necessary for the construction of the building. The Government retained an inspector on the premises to insure that the building would be of the quality con-

tracted for, however, it is very clear that the inspector had no right or authority under the contract to direct or supervise the performance of the work of the contract, and at no time did the inspector exercise such authority.

Counsel has not cited, and the Court has been unable to find, a Fourth Circuit case that is directly in point. However, our Fourth Circuit, in Regan, Inc. v. Parsons, et al., 411 F.2d 379 (1969), recently rendered an analogous decision that concerns itself with private individuals. The Court, in construing a construction contract that by its terms provided that the owner could have consulting engineers on the job site with certain authority to supervise, inspect, and reject the work of the contractor if it did not meet the contract requirements, held that there was no duty running from the engineers toward the contractors or their personal property. In reaching this conclusion the Fourth Circuit relied, in part, on the New York case of Ramos v. Shumavon, 21 A.D.2d 4, 247 N.Y.S.2d 699, aff'd per curiam, 15 N.Y.2d 610, 203 N.E.2d 912 (1964). In *Ramos*, a general contractor on an expressway construction project built some temporary concrete forms. These forms collapsed, injuring the plaintiff, an employee of the contractor. Suit was brought against the supervising engineers employed by the state. The forms had been improperly constructed and maintained by the contractor-employer. The question presented was whether the supervising engineer was liable because he did not affirmatively inspect and discover the condition and, therefore, could be found negligent by his passive act of omission. The contract provided that the work should be pursued in the most expeditious manner possible, "having due regard for the safety of persons," and all methods and procedures being subject to the approval of the engineer. The New York Court found no liability attached to the engineers because the contract did not require a positive duty

of continuing inspection on the part of the engineers to insure the safety of the workmen. Therefore, the Fourth Circuit has endorsed the concept that no duty exists between supervising personnel of the owner and an independent contractor's employees, when the supervising personnel's only connection with the mode of operation is a contractual reservation of inspection.

## II

That visibility at the time and place of the accident in the instant case was excellent is undisputed, and the plaintiff admits he saw the missing plywood from the section of the scaffold and the unsupported condition of the plank from which he fell before he attempted to walk on the plank. Under such circumstances, the plaintiff should have known that these conditions were conditions from which it was likely that he would fall and be injured. He cannot shut his eyes to a known danger and act oblivious to it and then expect to recover at law for the consequences of his carelessness. Sesler v. Rolfe Coal Co., 51 W.Va. 318, 41 S.E. 216 (1902). Generally, one cannot charge another in damages for negligence where he himself failed to exercise due care for his own safety. Shanklin v. Allis-Chalmers, 254 F.Supp. 223 (S.D.W.Va.1966), aff'd 383 F.2d 819 (4th Cir. 1967). It is, of course, well recognized that the nature of one's work and the potential danger attendant upon the activity of its performance dictate the degree of care required to be exercised in a given situation. The care used must be in proportion to, or commensurate with, the danger known to exist or to be foreseen by a reasonably prudent person in like circumstances. Harner v. Somerset Steel, 284 F.Supp. 553 (N.D.W.Va.1967); Gowdy v. United States, supra. Viewing the evidence and circumstances of the instant case in the light of these principles of law, and considering the plaintiff's

long experience in construction work and the nature of the particular activity in which he was engaged at the time of the accident, the conclusion is inescapable (and one on which reasonable minds could not differ) that the plaintiff did not on the occasion in question exercise the degree of care for his own safety that an ordinary prudent person, in like circumstances, would have exercised, and the plaintiff having failed in this duty, he cannot recover for the proximate consequences of his negligent conduct. Moreover, there is another well recognized rule of law which bars him from recovering damages in this action. It is this: When one recognizes an obvious hazard which he may circumvent by pursuing an alternate course but voluntarily chooses the hazardous one instead and is injured as a consequence, he is negligent as a matter of law. 38 Am.Jur. Sec. 193 (Negligence), p. 873. The evidence clearly shows that plaintiff could have secured the needed water without using the scaffolding at all, i. e., by having the water hose thrown to him on the second floor or by descending to the ground by the wooden ladder which extended from the first floor through an opening in the second floor. It was thus negligent conduct by the plaintiff to use the scaffold in its known defective condition in going for the water, and this negligence was compounded by his attempting to return by the same route in the face of such known danger.

### III

In summary, therefore, it is concluded that the plaintiff cannot recover in this action because there is no primary negligence to be found on the part of the defendant for the reason that the defendant owed plaintiff no duty of inspection and the defendant did not control the plaintiff's worksite. Also, the plaintiff is barred from recovery because of his own negligence which either proximately caused or proximately contributed to the accident and his resultant injuries.